# United States Court of Appeals
## For the First Circuit

No. 16-1009

UNITED STATES OF AMERICA,

Appellee,

v.

RAFAEL HUMBERTO CELAYA VALENZUELA,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph Laplante, Chief U.S. District Judge]

---

Before

Howard, Chief Judge,
Souter, Associate Justice,[*]
and Stahl, Circuit Judge.

---

Julie K. Connolly, with whom Julie Connolly Law, PLLC was on brief, for appellant.
Seth R. Aframe, Assistant United States Attorney, with whom Emily Gray Rice, United States Attorney, was on brief for appellee.

---

February 24, 2017

---

    [*] Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**STAHL**, **Circuit Judge**.  Beginning in May of 2009, the FBI launched a sting operation, codenamed Operation Dark Water, targeting the Sinaloa Drug Cartel.  Undercover agents held themselves out as an organized crime operation, led by an Italian mafia boss who went by the name El Viejo ("the Old Man"), which sought to procure a long-term source of cocaine from the cartel.  Among the high-level cartel members eventually ensnared by this investigative web was Rafael Humberto Celaya Valenzuela ("Celaya"), a financial planner and lawyer with close personal ties to the Cartel's then-leader, Joaquin Guzman-Loera, known more commonly as "El Chapo."  Celaya was charged in the District of New Hampshire with conspiracy to distribute and possess with intent to distribute controlled substances, in violation of 21 U.S.C. § 846.  He was convicted following a five-day jury trial and sentenced to 210 months imprisonment, and now appeals both his conviction and sentence.  Finding no merit to his various claims, we AFFIRM.

## I. Facts & Background

Celaya first came to the attention of law enforcement in August 2010, when he accompanied Jesus Manuel Gutierrez-Guzman ("Guzman"), El Chapo's cousin and close confidant, and other co-conspirators to a meeting with the undercover agents (the "FBI Organization") in Hallandale, Florida.[1]  At that meeting, Celaya

---

[1] Of course, the conspiratorial agreement was among members of the Chapo Organization, because a defendant cannot be guilty of

-2-

was introduced as a lawyer and financial planner. The parties discussed how their partnership could move forward, with the FBI Organization expressing a preference for using seaports on the east coast of the United States as a transit point for shipments of cocaine from South America to Europe. The FBI represented to the Chapo Organization that because of their contacts in the longshoremens' unions at the ports, they could ensure smooth entry into and out of the ports, while avoiding detection by customs authorities. They suggested this method would be advantageous because shipments sent directly from South America to Europe would be more likely to raise suspicion. The specific ports discussed, and subsequently included on code sheets drawn up by the Chapo Organization for use in future communications, were Philadelphia, Newark, Providence, and Portsmouth, New Hampshire.

Celaya made statements at this meeting that it was his understanding that the FBI Organization had contacts in the stevedores' unions that would allow the drugs to be repackaged and sent on to Europe. He reiterated that the Chapo Organization did not have a preference for a particular port, but would simply "prefer the port that you say is the safest one for you." When Guzman expressed concerns that "the gringos are really fucking with everyone about coming into the United States," the defendant

---

conspiring to commit crimes with government agents. See, e.g., United States v. Nelson-Rodriguez, 319 F.3d 12, 39 (1st Cir. 2003).

sought to allay these fears by suggesting that "if the product is sent directly [to] Europe it will have a red flag on it already . . . Once it's brought in [to U.S. ports], relabeled and sent . . . [i]t practically goes preapproved." The defendant added that using U.S. ports, where the FBI Organization had local dockworkers in on the scheme, would be a "green light." The following day, the parties met again to discuss methods for laundering the proceeds from the drug sales. Celaya was a central player in these discussions, apparently because of his legal and financial expertise.

On April 21, 2011, Guzman met with El Viejo, the FBI agent purporting to be the head of the crime organization, at a hotel in New Hampshire near Portsmouth. The purpose of the meeting was to discuss the first shipment on which the two sides would be cooperating, which would originate in Ecuador and be shipped to Spain. While Guzman explained that it was El Chapo's preference for this first shipment to proceed directly from Ecuador to Spain without stopping in any U.S. ports, he said that the Chapo Organization was open to "modifying" the delivery method in the future.

Also in that meeting, El Viejo told Guzman that the cocaine provided by the Chapo Organization would be distributed in Europe and the United States, because he had many clients that needed the drugs, including in Florida and New Hampshire. El Viejo

told Guzman that "everybody thinks I'm a legitimate businessman," adding that "I'm like the American Donald Trump . . . except I don't have the hair" and "there is going to be an explosion of business" once El Viejo could obtain El Chapo's "high quality product." Guzman replied that he understood that distribution in the United States was one of El Viejo's objectives. Guzman also made reference to the defendant, telling El Viejo that Celaya was a trusted member of the Chapo Organization and that he had personally met with El Chapo and "explained everything to him." Other meetings followed, including one in Boston in August 2011 at which the defendant was present.

Initially, a series of delays, including the Chapo Organization's desire to run several test shipments without contraband, prevented the actual shipment of cocaine to Europe. In order to maintain the goodwill of the FBI Organization, on June 7, 2012, Guzman arranged for the delivery of heroin to the FBI Organization in Detroit, Michigan. In July 2012, the Chapo Organization finally sent 346 kilograms of cocaine from Brazil to Algeciras, Spain, bypassing U.S. ports. The following month, Guzman traveled to Spain to meet with El Viejo. At that meeting, El Viejo reiterated that the United States would be one of the destinations for the cocaine shipped by the Chapo Organization in the future, to which Guzman replied, "Yes, sir."

Shortly after this meeting, Spanish authorities placed Celaya under arrest. After Celaya waived his Miranda rights, the FBI then interviewed him. In that interview, Celaya admitted that he had conspired to distribute cocaine, and that in March 2011, after one of the initial meetings, he had travelled to Mexico to personally meet with El Chapo. At that meeting, he told El Chapo that he believed the FBI Organization was a real drug cartel and that El Chapo should proceed with the plan to supply it with cocaine.

Celaya was indicted in the District of New Hampshire and charged with conspiring, between March 2009 and September 2012, to distribute and possess with intent to distribute a quantity of heroin, methamphetamine, and 1,000 kilograms or more of cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1). The case proceeded to a jury trial. At the close of the government's case-in-chief, the defendant moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29, claiming that there was insufficient evidence that he had participated in the conspiracy, and that there was insufficient evidence of venue. More specifically, he argued that at the time the actual shipments took place, he "was no longer in the picture" and was not involved in the conspiracy. On the venue point, he argued that the only overt act in furtherance of the conspiracy that occurred in New Hampshire was the Portsmouth meeting, and since it was an FBI source who drove Guzman from

Boston's Logan Airport to the meeting, the government had "manufactured" venue in New Hampshire.

The district court denied this motion, and after a five-day trial, the jury returned a guilty verdict against Celaya. Six months after the verdict, Celaya filed a motion to reconsider the denial of his earlier Rule 29 motion, raising for the first time the argument that the overarching conspiracy did not have a sufficient jurisdictional nexus to the United States, and that the government had failed to present any evidence that Celaya knew that an object of the conspiracy was to possess or distribute controlled substances in the United States. The district court denied this motion as untimely, but also concluded that the defendant's argument on jurisdictional nexus would have failed on the merits in any event since the evidence introduced at trial was sufficient for a jury to conclude that the conspiracy envisioned the distribution of drugs into the United States and the use of seaports on the east coast of the United States as transit points on the way to Europe, and that overt acts in furtherance of the conspiracy took place on U.S. soil.

At sentencing, the district court calculated that the defendant's criminal conduct warranted a total offense level of 38 (largely as a result of the weight of drugs attributed to the conspiracy) and a criminal history category of I, which yielded a guideline sentence range of 235 to 293 months imprisonment. The

district court rejected a defense counsel request for a minimal/minor role downward adjustment under U.S.S.G. § 3B1.2, concluding that the defendant was a "top level negotiator . . . with access to the highest levels of the cartel." The court ultimately did allow a minor downward variance to bring Celaya's sentence in line with that of Guzman (who had pleaded guilty), eventually settling on 210 months' imprisonment. This appeal followed.

## II. Discussion

On appeal, Celaya challenges three aspects of the district court's ruling below. First, he argues that the government failed to prove that the conspiracy in question had a "jurisdictional nexus" to the United States. Second, he argues that the government "manufactured" venue in the District of New Hampshire by driving Guzman, a co-conspirator, from Boston's Logan Airport across the border into New Hampshire for a meeting. As a derivative of those arguments, Celaya contends that the district court's failure to instruct the jury on jurisdictional nexus and manufactured venue was in error. Third, he argues that his 210-month prison sentence was substantively unreasonable. We address, and dispose of, each of these arguments seriatim.

A. Jurisdictional Nexus

*i. Standard of Review*

The first group of challenges that Celaya presents concerns the sufficiency of evidence against him at trial and the district court's denial of both his Rule 29 Motion for a Judgment of Acquittal and his Motion for Reconsideration of his Motion for Judgment of Acquittal. The Court of Appeals reviews the denial of a motion to reconsider for an abuse of discretion. See United States v. Allen, 573 F.3d 42, 53 (1st Cir. 2009). However, when a Rule 29 motion (or a Motion to Reconsider a previous Rule 29 motion) presents a new argument not previously presented to the district court, appellate review is more circumscribed. See United States v. Castro-Lara, 970 F.2d 976, 980 n.2 (1st Cir. 1992) ("Where a Rule 29 motion is not preserved for appeal, the defendant forfeits the benefit of the customary standard of review, thereby negating any claim of evidentiary insufficiency unless affirming the conviction would work a 'clear and gross injustice.'") (quoting United States v. Cheung, 836 F.2d 729, 730 n.1 (1st Cir. 1988)).

We find that the "jurisdictional nexus" argument was not timely raised in the district court, either at trial or in Celaya's original Rule 29 motion. The only arguments made by the defendant in his original Rule 29 motion were that (1) he was not actually a member of the conspiracy, and (2) there was insufficient evidence of venue in New Hampshire. At no point did he raise the objection

- 9 -

that the alleged conspiracy was entirely extraterritorial in nature and thus insufficient, as a matter of law, to convict him for a violation of 21 U.S.C. § 846 if the jury found that he was a member of the conspiracy. In fact, in his Rule 29 Motion, Celaya conceded that "there was substantial evidence introduced by the Government that could reasonably be understood by the jury to show that the Sinaloan cartel wanted to expand its drug trafficking network into Europe, and perhaps the United States." After conceding this point, however, the defense argued that "the evidence failed to demonstrate that the cartel actually agreed to include Celaya in that conspiracy."

Six months later, in his Motion for Reconsideration, Celaya switched gears, arguing that while the jury may have found that he was a member of the conspiracy, the evidence adduced at trial "can only be reasonably and fairly understood as establishing that the [sic] Celaya and his coconspirators agreed to the common goal of shipping cocaine from South America to Europe" and nothing in the record "remotely shows, or even suggests, that Celaya knowingly agreed to participate in a conspiracy to distribute or possess with intent to distribute illegal drugs in New Hampshire or anywhere else in the United States, so as to violate §§ 841(a) and 846." Indeed, at oral argument before the district court accompanying their motion for reconsideration, defense counsel

admitted that this was a new argument that they had not previously presented to the court.[2]

We have routinely emphasized that a party's decision to adopt this sort of shifting litigation tactic results in an elevated standard of review.  See, e.g., United States v. Marston, 694 F.3d 131, 134 (1st Cir. 2012) ("[W]hen a defendant chooses only to give specific grounds for a Rule 29 motion, all grounds not specified are considered waived and are reviewed under [the] less forgiving 'clear and gross injustice' standard.") (quoting United States v. Upham, 148 F.3d 532, 537 (1st Cir. 1999), cert. denied, 527 U.S. 1011 (1999));  United States v. Foley, 783 F.3d 7, 12 (1st Cir. 2015) (stating that when a "sufficiency challenge [is] unpreserved,"  the appeals court "review[s] for clear and gross injustice only").

---

[2] THE COURT: As I read this argument, it is not an argument you've ever made before you filed this motion; is that right?

COUNSEL: That's right, your Honor.

...

COUNSEL: I think that the papers readily concede that the lawyers did not present this argument to you, so it's not that we presented it and you missed it. It was that this is a new argument that wasn't presented before and it would result in a manifest error of law if it were to stand going forward, and therefore we're presenting it to the Court now and giving the Court an opportunity to consider it.

Because a Motion for Reconsideration of the denial of a previous Rule 29 motion is not the appropriate time to raise new, much less contradictory, arguments, we will affirm the district court's ruling unless doing so would produce a "clear and gross injustice." Cheung, 836 F.2d at 730 n.1. Under this "stringent standard, which we have described as a particularly exacting variant of plain error review," Foley, 783 F.3d at 12, the "already high bar for plain error becomes even higher." United States v. Acosta-Colón, 741 F.3d 179, 192-93 (1st Cir. 2013). Even to prevail under the more lenient plain error review, a defendant must show (1) that an error occurred, (2) which was clear or obvious, (3) that affected the defendant's substantial rights, and (4) seriously impaired the fairness, integrity, or public reputation of the judicial proceedings. United States v. Flemmi, 402 F.3d 79, 86 (1st Cir. 2005). As we explain below, there was no error in finding that an adequate jurisdictional nexus existed between the conspiratorial agreement and objectives and the United States, and Celaya therefore cannot prevail under plain error review, much less under the more exacting "clear and gross injustice" standard.

## ii. Jurisdictional Nexus

The question of what is required to prove a sufficient jurisdictional nexus with the United States to prosecute a § 846 conspiracy is an issue that has not been squarely addressed by

this Court.  However, both parties agree that some jurisdictional nexus is required.  This conclusion is bolstered by the general presumption that Congress does not legislate with extraterritorial effect unless clearly specified.[3]  Finally, this Court has held that § 841, which covers distribution or possession with the intent to distribute controlled substances, does not cover purely extraterritorial crimes.  See United States v. Hayes, 653 F.2d 8, 15 (1st Cir. 1981); see also United States v. McKenzie, 818 F.2d 115, 118 (1st Cir. 1987) (holding that § 841 is triggered if the

---

[3]  In a case decided last June, the Supreme Court clarified its test for deciding whether a statute applies extraterritorially. See RJR Nabisco, Inc. v. European Cmty., 136 S. Ct. 2090, 2101 (2016).

> Morrison and Kiobel reflect a two-step framework for analyzing extraterritoriality issues.  At the first step, we ask whether the presumption against extraterritoriality has been rebutted—that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially. We must ask this question regardless of whether the statute in question regulates conduct, affords relief, or merely confers jurisdiction. If the statute is not extraterritorial, then at the second step we determine whether the case involves a domestic application of the statute, and we do this by looking to the statute's "focus." If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory.

Id. (citing and discussing Morrison v. Nat'l Austl. Bank Ltd., 561 U.S. 247 (2010) and Kiobel v. Royal Dutch Petroleum Co., 133 S. Ct. 1659 (2013)).

- 13 -

defendant intended that the controlled substances be distributed in the United States, even if no actual distribution took place, or if the defendant possessed the controlled substances in the United States with the intent to distribute the drugs abroad). Because a conspiracy under § 846 is an agreement to violate § 841, it stands to reason that the same jurisdictional requirement needs to be met. However, in this case, several specific factors, including the meeting in New Hampshire between Guzman and El Viejo, the discussion of using eastern seaboard ports for future trafficking, and the shipment of heroin and methamphetamine to Detroit in June 2012, combine to clearly satisfy the required jurisdictional nexus.

Celaya first contends that the meeting in New Hampshire between Guzman and El Viejo, the undercover FBI agent posing as a mafia boss, is not enough evidence to establish a jurisdictional tie to the United States. Celaya makes the same argument with respect to the meetings in Florida and Boston that he himself attended. In support of this argument, he cites United States v. Lopez-Vanegas, 493 F.3d 1305 (11th Cir. 2007), for the proposition that meetings inside the United States are not sufficient to establish a jurisdictional nexus when "the object of the conspiracy was to possess controlled substances outside the United States with the intent to distribute outside the United States." Id. at 1313. This is true enough, and the government in this case

concedes that mere meetings in the United States to discuss the details of an entirely international drug distribution scheme would not be sufficient.

However, the problem for Celaya with this argument is twofold. First, there was other evidence suggesting that members of the conspiracy, including Guzman, saw distribution in the United States as one of the objects of the conspiracy. In a meeting, El Viejo informed Guzman that their goal in acquiring cocaine from the Chapo Organization was to distribute the drugs in the United States, among other places, and Guzman responded affirmatively that he understood this. Celaya protests that it was the government agent, not Guzman, who discussed plans to distribute drugs in the United States. However, this is a distinction without a difference when dealing with conspiracy liability, as conspirators who have previously entered into a criminal agreement among themselves, in concert with government agents, can be convicted based on the distribution plans articulated by government agents if they fail to object to those plans. See United States v. Giry, 818 F.2d 120, 125 (1st Cir. 1987) (finding that even though the two defendants' role was limited to importing cocaine from Colombia to the West Indies, liability still attached because they "agreed to arrange and carry out the cocaine sale after being told by agents . . . of the latters' plans to import the cocaine for distribution in the New York area").

- 15 -

Second, Celaya's argument that he did not know about the New Hampshire meeting fails because there is no governing law in this circuit which suggests that Celaya's alleged lack of knowledge of the actions of his co-conspirator is a defense to liability. Indeed, one out-of-circuit case appears to suggest the opposite. See United States v. Manuel, 371 F. Supp. 2d 404, 409 (S.D.N.Y. 2005) (holding that where a crime is within the jurisdiction of the United States, it is not necessary that the defendant know the facts that establish jurisdiction). Such a rule fits with the broader principles of conspiracy liability enforced by courts, including the First Circuit. See United States v. Barnes, 244 F.3d 172, 176 (1st Cir. 2001) (noting that "[o]nce a participant knowingly helps to initiate the agreement and set it in motion, he assumes conspirator's responsibility for the foreseeable actions of his confederates within the scope of the conspiratorial agreement, whether or not he is aware of precisely what steps they plan to take to accomplish the agreed goals").

Two more points undermine Celaya's argument. First, Guzman, one of his co-conspirators and a close cousin and lieutenant of El Chapo, arranged for a delivery of drugs (heroin and methamphetamine) to Detroit in June 2012 in order to maintain the goodwill of the FBI Organization and to make amends for having failed to disclose that one of the first shipments to Spain was a test run that did not contain any actual drugs. It is immaterial

- 16 -

that Celaya did not "explicitly or tacitly agree[] to the delivery of drugs to Detroit," as he argues in his brief. The discussions between the Chapo Organization and the FBI Organization were sufficient to find that members of the Chapo Organization entered into a major, transnational conspiracy in which they agreed to regularly supply the FBI Organization with drugs for distribution primarily in Europe, but also the United States. The Detroit shipment was designed to build goodwill and maintain the relationship in light of frustrations on the part of the FBI Organization with some of the delays and expense connected with the initial cocaine shipment to Spain. It was not, therefore, a one-off event, nor was it a separate conspiratorial agreement. Rather, the Detroit shipment was part of the ongoing conspiracy. There was no gross injustice in finding that Celaya was a part of this conspiracy and that the Detroit shipment, when coupled with Guzman's knowledge that some of the drugs were to be delivered into the United States and with the meeting in New Hampshire to advance these plans, was sufficient to establish the required jurisdictional nexus to the United States.[4]

---

[4] We also find Celaya's argument that he was no longer a member of the conspiracy at the time of the Detroit shipment to be without any factual basis in the record. As counsel for Celaya conceded at oral argument, this would require a showing that Celaya had withdrawn from the conspiracy sometime between 2011 and the June 2012 shipment, and he has made no such showing.

- 17 -

Second, the jury reasonably could have found that the parties continued to contemplate the use of seaports on the east coast of the United States, even if the one shipment of cocaine to Spain which actually took place did not proceed via a U.S. port. At meetings in Madrid, Spain, in March 2011, a representative of the Sinaloa Cartel, Jose Locheo del Rio, expressed concern about the use of American ports when the drugs originated in Ecuador (as they were scheduled to in the initial shipment), because this would mean the drugs would have to travel through the Panama Canal. In particular, Del Rio expressed concern that the use of the Panama Canal would require a transfer by train which could render the drugs susceptible to hijackings and also to law enforcement interdictions. However, representatives from the Chapo Organization also emphasized at various points during their meetings that the drugs would originate in various South American countries, including some along the Atlantic Ocean, and they never definitively ruled out the use of U.S. ports as a transit point that might reduce law enforcement suspicion. Therefore, a jury could reasonably have found that the use of eastern seaports in the continental United States continued to be contemplated by the parties for future shipments, as agreed to during the August 2010 Florida meetings.

In conclusion, unlike in Lopez-Vanegas, there was sufficient evidence for a jury to find that this was not an

- 18 -

entirely "international" drug distribution scheme which, but for the meetings in the United States, would have had no connection to the country. As previously discussed, Celaya himself conceded in his Rule 29 motion that "there was substantial evidence introduced by the Government that could reasonably be understood by the jury to show that the Sinaloan cartel wanted to expand its drug trafficking network into Europe, and perhaps the United States."

Our holding does not rest on any individual factor identified above, rather, taken together, we think they clearly meet the jurisdictional nexus requirement, and the district court's decision to deny Celaya's Rule 29 Motion and his Motion for Reconsideration did not result in a "clear and gross injustice." Finally, because we have found that there was more than sufficient evidence for a jury to find that the conspiracy both involved the intent to distribute controlled substances in the United States and, on one occasion, *did* include such a shipment, we find no error in the district court's failure to specifically instruct the jury on jurisdictional nexus.

B. Venue

Celaya's second argument for acquittal is that there was insufficient evidence that the conspiracy was "begun, continued or completed" in the District of New Hampshire, and thus venue was improper. Because this argument was included in the defendant's original Rule 29 motion, we undertake de novo review. See, e.g.,

Marston, 694 F.3d at 134.  With respect to sufficiency of venue, the government must prove venue by a preponderance of the evidence. United States v. Scott, 270 F.3d 30, 34 (1st Cir. 2001).

According to Celaya, the three pieces of evidence offered by the government to establish venue in New Hampshire, (i) including Portsmouth on the list of possible transit ports for shipments; (ii) representing that El Viejo would distribute his cocaine in New Hampshire, among other places; and (iii) bringing Guzman to New Hampshire from Logan Airport to meet with El Viejo, were all insufficient.  This argument fails because an overt act in furtherance of the conspiracy, the meeting between Guzman and El Viejo, clearly took place in Portsmouth, NH.  At that meeting, Guzman and El Viejo discussed detailed plans for the Chapo Organization's role in providing cocaine to the FBI Organization. This discussion represented a key part of the planning process after the various members of the Chapo Organization had reached an agreement among themselves to provide cocaine to the FBI Organization.  Since Guzman was a clear co-conspirator of Celaya, it is immaterial that Celaya himself was not present at this meeting.  See United States v. Santiago, 83 F.3d 20, 25 (1st Cir. 1996) ("[I]n a conspiracy case venue is proper in any district in which an act in furtherance of the charged conspiracy has taken place, even if a particular coconspirator was not himself physically present in that district.")

Celaya's fallback argument is that because it was a government agent who drove Guzman from Boston's Logan Airport to the Portsmouth meeting, the government "manufactured" venue in New Hampshire, and therefore this fails as a matter of law. However, the First Circuit has never accepted the existence of a "manufactured venue" doctrine, and most circuits have rejected the concept of manufactured venue or "venue entrapment." See, e.g., United States v. Rodriguez-Rodriguez, 453 F.3d 458, 462 (7th Cir. 2006) ("[Government] agents may influence where the federal crime occurs, and thus where venue lies, as well as whether the crime comes under federal rather than state law. The entrapment doctrine protects the defendant against manufactured offenses (unless the defendant is predisposed); it does not limit venue."); see also United States v. Al-Talib, 55 F.3d 923, 929 (4th Cir. 1995) ("There is no such thing as 'manufactured venue' or 'venue entrapment.'"); United States v. Spriggs, 102 F.3d 1245, 1250 (D.C. Cir. 1996) ("[W]e are uncertain whether there is such a thing as 'venue entrapment.' It is a little hard to conceive of a person predisposed to commit a federal crime--but not in some specific district.")[5]

---

[5] Even the two circuits that have not categorically refused to rule out manufactured venue have emphasized that it would only be viable in cases of extreme government misconduct. See United States v. Chi Tong Kuok, 671 F.3d 931, 938 (9th Cir. 2012) (electing not to reach the question of whether a manufactured venue challenge might succeed because there was nothing "extreme" about

- 21 -

The better rule appears to be that to the extent that prosecutorial forum shopping "is a concern in a given case, it is more appropriately handled at the trial level by a transfer to a more reasonable forum" under Federal Rule of Criminal Procedure 21. Andrews v. United States, 817 F.2d 1277, 1279-80 (7th Cir. 1987). Indeed, it is hard to understand what the underlying logic for "venue entrapment" would be, since entrapment in criminal law is designed to avoid punishment for "an 'otherwise innocent' person whose 'alleged offense' is 'the product of the creative activity' of government officials," United States v. Gendron, 18 F.3d 955, 961 (1st Cir. 1994) (quoting Sorells v. United States, 287 U.S. 435, 451 (1932)), not to avoid punishment for a defendant involved in a wide-ranging global narcotics conspiracy because government agents drove one of his co-conspirators an hour from Boston to Portsmouth, NH, for a meeting to discuss a planned drug

_____

an Immigration and Customs Enforcement undercover operation, based in San Diego, deciding to cash the foreign defendant's money order for arms sales in a bank in San Diego, thus leading to venue in the Southern District of California); United States v. Myers, 692 F.2d 823, 847 n.21 (2d Cir. 1982) (not precluding a possible manufactured venue defense "in which key events occur in one district, but the prosecution, preferring trial elsewhere, lures a defendant to a distant district for some minor event simply to establish venue," but finding that standard inapplicable in that case). Indeed, in a more recent case, the Second Circuit noted that "[i]n the quarter century since Myers, this court has never vacated a conviction on the basis of manufactured venue." United States v. Rommy, 506 F.3d 108, 127 (2d Cir. 2007).

distribution network.  The high-level meeting in New Hampshire involving Guzman, a co-conspirator and close confidant of El Chapo -- the Sinaloa Cartel's chief -- suggests an even stronger argument for venue than previous acts found sufficient for venue in federal courts, including telephone conversations.  See, e.g., United States v. Cordero, 668 F.2d 32, 44 (1st Cir. 1981) (noting that phone calls from defendants outside of Puerto Rico to a co-conspirator in Puerto Rico was likely sufficient for venue to lie in Puerto Rico because the offense "continued" in that forum, but finding the appellants' argument waived in any event).

        We therefore join the other circuits in rejecting the manufactured venue doctrine.  However, even if such a doctrine were to be available in extreme cases of government misconduct, that would simply not be the case here.  The undercover agent drove Guzman from Boston's Logan Airport to a Portsmouth, NH-area hotel for a meeting (a drive of roughly an hour).  We see no reason why the government could not bring its case in an adjacent jurisdiction, when it could have arranged the meeting just a few miles south in Massachusetts and secured venue there without any possible objection.

        C. Reasonableness of the Sentence

        Celaya's final argument is that his 210-month prison sentence was unreasonable, on the grounds that the district court erred by failing to give him a downward adjustment for what he

claims was a minor role in the conspiracy, and also erred in applying the sentencing factors under 18 U.S.C. § 3553. We are not convinced.

To qualify for a three-level reduction for a minimal/minor role in the offense under U.S.S.G. § 3b1.2(b), a defendant bears the burden of showing that he is less culpable than his confederates and less culpable than "most other miscreants convicted of comparable crimes." United States v. Montes-Fosse, 824 F.3d 168, 172 (1st Cir. 2016) (quoting United States v. Ortiz-Santiago, 211 F.3d 146, 149 (1st Cir. 2000). Because "[r]ole-in-the offense determinations are notoriously fact-sensitive," the district court's "decision to apply a minor-role reduction is subject to clear error review." Id. (citing Ortiz-Santiago, 211 F.3d at 148-49).

Here, the district court properly considered whether the reduction was appropriate, and found that it was not. Specifically, the court noted that Celaya was at the negotiating table with the FBI Organization and, in light of his legal and financial background, was a leading voice in discussing the money laundering aspects of the conspiracy. He also admitted to meeting with El Chapo personally in the mountains in Mexico to recommend that the Sinaloa Cartel enter into a partnership with the FBI Organization. We find no reason to conclude that the district

court committed plain error in not applying the three-level reduction.

Finally, Celaya argues that his sentence was substantively unreasonable because he received a sentence that was longer than those of his co-conspirators, who received sentences ranging from 60 months to 192 months. The latter sentence was handed down to Guzman, and Celaya contends that it was unreasonable to sentence him to a term of imprisonment that was eighteen months longer than Guzman, who was El Chapo's right-hand man and "dominated the conspiracy proven at trial" by attending every single meeting with the undercover agents and orchestrating the shipment of drugs to Detroit. This sentencing decision, according to Celaya, resulted in a misapplication of the § 3553(a) factors, which require that a Court "avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

This argument fails for two reasons. First, it is not clear from the record that Guzman was necessarily a more central player than Celaya, who met with El Chapo and was intimately involved in the planning process for the conspiracy. Therefore, the fact that his sentence exceeded that given to Guzman and other co-conspirators may well constitute a "plausible sentencing rationale and a defensible result," United States v. Rivera-Gonzalez, 626 F.3d 639, 647 (1st Cir. 2010) (quoting United States

v. Martin, 520 F.3d 87, 96 (1st Cir. 2008)), as required under this court's standard of review for the substantive reasonableness of a sentence. Secondly, if that is not enough, there was a crucial difference between Celaya and his co-defendants: Celaya was the only one who elected not to plead guilty. Therefore, while Guzman and other co-defendants were entitled to a three-level reduction for acceptance of responsibility, Celaya was not. This court "routinely [has] rejected disparity claims" where "complaining defendants . . . fail to acknowledge material differences between their own circumstances and those of their more leniently punished confederates." United States v. Reyes-Santiago, 804 F.3d 453, 467 (1st Cir. 2015). A decision to proceed to trial, rather than to plead guilty alongside other co-defendants, is a permissible factor that a court may consider in determining a possible sentencing disparity between a defendant and his other coconspirators. See, e.g., United States v. Ortiz-Islas, 829 F.3d 19, 29 (1st Cir. 2016). For both of the above reasons, Celaya's claim that the sentence was substantively unreasonable fails.

### III. Conclusion

For the aforementioned reasons, we AFFIRM Celaya's conviction and sentence.