# United States Court of Appeals
## For the First Circuit

No. 16-1322

UNITED STATES OF AMERICA,
Appellee,

v.

JUAN TANCO-BAEZ,
Defendant, Appellant.

No. 16-1323

UNITED STATES OF AMERICA,
Appellee,

v.

JOSÉ CEPEDA-MARTÍNEZ,
Defendant, Appellant.

No. 16-1563

UNITED STATES OF AMERICA,
Appellee,

v.

PETER ROSARIO-SERRANO,
Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Daniel R. Domínguez, U.S. District Judge]

Before

Howard, Chief Judge,
Kayatta and Barron, Circuit Judges.

Lydia Lizarribar-Masini, for appellant Tanco-Baez.

Eleonora C. Marranzini, Assistant Federal Public Defender, with whom Eric A. Vos, Federal Public Defender, and Vivianne M. Marrero-Torres, Assistant Federal Public Defender, Supervisor, Appeals Section, were on brief, for appellant Cepeda-Martínez.

Jennie Mariel Espada, for appellant Rosario-Serrano.

Thomas F. Klumper, Assistant United States Attorney, Senior Appellate Counsel, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, and Mariana E. Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate Division, were on brief, for appellee.

November 4, 2019

**BARRON**, <u>Circuit Judge</u>.  Juan Tanco-Baez ("Tanco"), José Cepeda-Martínez ("Cepeda"), and Peter Rosario-Serrano ("Rosario") were indicted in the United States District Court for the District of Puerto Rico on three counts of federal firearms charges arising out of a drive-by shooting.  Cepeda and Rosario each challenge their conviction on one of those counts and Tanco challenges his conviction on two of those counts, while Tanco and Cepeda also challenge their sentences for their convictions on those counts. We reject all three co-defendants' challenges to their convictions, except for Cepeda's challenge to his conviction on one of the counts, which we agree is not supported by sufficient evidence and must be reversed.  We affirm Tanco's sentence, but we vacate and remand Cepeda's sentence not only for the conviction that we reverse but also for the one that we affirm, as we conclude that our reversal of his other conviction requires that result.

## I.

The following facts are not in dispute.  On the morning of March 26, 2014, Tanco, Cepeda, and Rosario participated in a drive-by shooting on the Román Baldorioty de Castro expressway in Carolina, Puerto Rico.  A witness reported seeing a high-speed car chase that involved a blue Toyota Yaris, a gray Toyota Yaris, and a wine-colored Jeep Cherokee.  The chase ended when the two Toyotas crashed under a bridge.  The Jeep remained at a close distance.  A

witness then heard two rounds of rapid gunfire. Thereafter, the three co-defendants fled the scene in the Jeep Cherokee.

Puerto Rico Police Department officers pursued the Jeep until it eventually stopped near a pedestrian bridge in the nearby city of San Juan. At that point, the three defendants abandoned the vehicle and fled on foot across the bridge to a housing project.

Cepeda was arrested almost immediately in the third-floor hallway of one of the buildings in the housing project. Law enforcement officers seized a pistol magazine that was found nearby. Officers also found and seized a bag of marijuana hidden inside Cepeda's shoe.

Tanco and Rosario were apprehended in an apartment within Building 46 of the housing project. The officers then searched the apartment. They found a pistol magazine under a table, a pistol frame inside a laundry bag, and two pistol magazines under a bed. The slide and barrel of the pistol found in the laundry bag were later found on either side of Building 46.

Officers also found two Glock pistols beside the Jeep Cherokee -- a model 17 and a model 27. The latter model had been modified to fire as a machinegun. Multiple shell casings from the scene of the shooting matched the three firearms seized in Building 46 and near the Jeep Cherokee.

On September 17, 2014, Tanco, Cepeda, and Rosario were indicted in the District of Puerto Rico as co-defendants on a number of federal firearms charges. Cepeda was charged with possession of firearms and ammunition by an unlawful user or addict of a controlled substance, in violation of 18 U.S.C. § 922(g)(3) (Count One); Tanco was charged with being a convicted felon in possession of firearms and ammunition, in violation of 18 U.S.C. § 922(g)(1) (Count Two); Tanco, Cepeda, and Rosario were each charged with aiding and abetting each other in the illegal possession of a machinegun, in violation of 18 U.S.C. § 922(o) (Count Three).

The three defendants proceeded to an eight-day jury trial in late June 2015. At trial, an expert testified that Tanco's DNA was present on the steering wheel and stick shift of the gray Yaris and a cigarette butt found in the driver's side of that car. The expert also testified that Rosario's DNA was found on the steering wheel of the Jeep.

A law enforcement agent testified at the trial as well. He stated through an interpreter that Cepeda admitted to him in a post-arrest interview that he had gone into a vehicle to smoke marijuana that day, that he "smoked on a daily basis and that it had been a long time since he had started," and that he possessed the machinegun on the day of the events.

The government did not introduce into evidence a written or recorded statement by Cepeda. Nor did the government introduce into evidence any notes that memorialized the law enforcement agent's interview with Cepeda, which had taken place over a year before trial.

The jury returned guilty verdicts against each of the defendants on all of the counts that each faced. Cepeda filed a motion for judgment of acquittal under Federal Rule of Criminal Procedure 29 on Counts One and Three, Tanco filed a Rule 29 motion on Counts Two and Three, and Rosario filed a Rule 29 motion on Count Three. The government opposed each Rule 29 motion, and the District Court denied them all.

On March 3, 2016, the District Court held sentencing hearings for both Tanco and Cepeda. Cepeda was sentenced to 120 months of imprisonment for his convictions on Counts One and Three, to be served concurrently with one another. Tanco was sentenced to 120 months of imprisonment as to his convictions on Counts Two and Three, also to be served concurrently.

Rosario's sentencing hearing was held on April 18, 2016. He received a sentence of 102 months' imprisonment on his conviction pursuant to Count Three. The District Court also imposed three-year terms of supervised release on all three co-defendants for their convictions.

Tanco, Cepeda, and Rosario filed timely notices of appeal. The consolidated appeals challenge: (1) the sufficiency of the evidence as to Cepeda's conviction on Count One for possession of firearms and ammunition by an unlawful user or addict of a controlled substance, in violation of 18 U.S.C. § 922(g)(3); (2) the sufficiency of the evidence for Tanco's conviction on Count Two for being a convicted felon in possession of firearms and ammunition, in violation of 18 U.S.C. § 922(g)(1); (3) the sufficiency of the evidence for Tanco's and Rosario's convictions on Count Three for aiding and abetting in the illegal possession of a machinegun, in violation of 18 U.S.C. § 922(o); and (4) the procedural and substantive reasonableness of Tanco's and Cepeda's sentences.

## II.

We begin by addressing the defendants' challenges to the denial of their Rule 29 motions, in which the defendants take aim at the sufficiency of the evidence supporting their convictions. We review de novo the District Court's denial of a Rule 29 motion that is based on a challenge to the sufficiency of the evidence to support a conviction. United States v. Cortes-Caban, 691 F.3d 1, 12 (1st Cir. 2012); United States v. Perez-Melendez, 599 F.3d 31, 40 (1st Cir. 2010). We undertake such review by considering the evidence in the record "in the light most favorable to the prosecution" and by determining whether, considered in that light,

- 7 -

the "body of proof, as a whole, has sufficient bite to ground a reasoned conclusion that the government proved each of the elements of the charged crime beyond a reasonable doubt." United States v. Lara, 181 F.3d 183, 200 (1st Cir. 1999).

## A.

We first consider Cepeda's challenge to the sufficiency of the evidence for his conviction on Count One for violating 18 U.S.C. § 922(g)(3), which makes it "unlawful for any person . . . who is an unlawful user of or addicted to any controlled substance . . . to . . . possess in or affecting commerce, any firearm or ammunition."  To establish the "unlawful user" element of this offense, the government must prove beyond a reasonable doubt that (1) the defendant used controlled substances regularly, (2) that the use took place over a long period of time, and (3) that the use was proximate to or contemporaneous with his possession of a firearm.  See United States v. Caparotta, 676 F.3d 213, 216 (1st Cir. 2012) (defining "unlawful user" under § 922(g)(3)); United States v. Marceau, 554 F.3d 24, 30 (1st Cir. 2009) (same).

Cepeda does not dispute that he possessed a firearm.  He contends only that the evidence was insufficient to support a finding that he was "an unlawful user of . . . any controlled substance" within the meaning of § 922(g).  He alleges that the only evidence in the record that could suffice to support that finding is the testimony from the law enforcement officer who

- 8 -

interviewed him that he admitted during that interview that he had been a regular, long-term drug user. Cepeda further contends that this evidence cannot suffice to establish that he was an "unlawful user," however, because, in his view, that admission was not corroborated.

The government agrees that the admission is necessary to prove Cepeda's regular, long-term drug use and thus that he was an "unlawful user." The government further agrees that the admission must be corroborated in order for it to be able to provide the requisite evidentiary support for a finding that he was an "unlawful user," such that his conviction then could survive Cepeda's sufficiency-of-the-evidence challenge. But, the government contends, his challenge still lacks merit.

The government asserts, first, that Cepeda failed to contend in his Rule 29 motion that the admission concerning the nature and duration of his drug use was not corroborated. Thus, the government contends, he has waived that ground for reversing his conviction for lack of sufficient evidentiary support, or, at least, he has forfeited that argument and cannot meet the demanding plain error standard that applies in consequence.

We do not agree. In his written Rule 29 motion, in addition to advancing various specific arguments, Cepeda made a general sufficiency-of-the-evidence challenge, claiming that "the government presented insufficient evidence at trial to support the

elements of the offenses of which he was convicted." See United States v. Foley, 783 F.3d 7, 12 (1st Cir. 2015) ("[A] general sufficiency-of-the-evidence objection preserves all possible sufficiency arguments."); United States v. Marston, 694 F.3d 131, 135 (1st Cir. 2012) ("There is good reason in case of doubt to treat an ambiguous [Rule 29] motion . . . as 'general' in the sense that it preserves all grounds."). In that written motion, Cepeda also called the District Court's attention to the lack of sufficient evidence to establish Cepeda's status as an unlawful user, while stating that "Officer Concepcion's testimony that Mr. Cepeda stated he had smoked marijuana 'for a long time' . . . without more . . . could not have persuaded a rational trier of fact that Mr. Cepeda was an unlawful [] user of controlled substances at the time of the charged offense." We know, too, that the government asserted, in response to this motion, that the evidence was sufficient to sustain the conviction, in part because Cepeda's "confession was corroborated by the testimonial and ballistic evidence presented on trial." We therefore conclude that this issue was not forfeited below. See United States v. Valenzuela, 849 F.3d 477, 487 (1st Cir. 2017) ("Because this argument was included in the defendant's original Rule 29 motion, we undertake de novo review.").

Alternatively, the government contends that even if Cepeda preserved this challenge below, it lacks merit because the

admission concerning his long-term drug use was corroborated. But, here, too, we disagree. To explain why, though, we need to provide some background about the relevant legal precedents on the weight that federal courts may give to certain types of incriminating statements by criminal defendants in assessing their evidentiary sufficiency challenges to their convictions. We begin by describing those precedents. We then explain why, in light of them, the admission that is at issue was not corroborated and thus cannot suffice to support the "unlawful user" element of the offense for which Cepeda was convicted.

**1.**

"It is a settled principle of the administration of criminal justice in the federal courts that a conviction must rest upon firmer ground than the uncorroborated admission or confession of the accused."  Wong Sun v. United States, 371 U.S. 471, 488-89 (1963).  This "corroboration rule" initially was intended to mitigate the risk that a false confession would lead to a conviction for a crime that not only had not been committed by the defendant but also that had not been committed by anyone else. See Smith v. United States, 348 U.S. 147, 153–54 (1954).

That risk was evident from early English and American cases.  Defendants in some of them had been sentenced to death for homicide solely on the basis of their confessions of guilt, but the supposed victims had then appeared, post-sentencing, "very

much alive."  David A. Moran, In Defense of the Corpus Delicti Rule, 64 Ohio St. L.J. 817, 826-31 (2003).

Courts thus began, in cases involving an offense that, like homicide, involved physical damage or injury, to demand evidence independent of the defendant's confession of what is known as the corpus delicti -- encompassing both an injury and a criminal cause for that injury.  Only with such evidence could a confession to that offense be considered corroborated.  And thus, only with such evidence could a conviction be deemed adequately supported by the evidence if the sufficiency of the proof depended upon the confession.

In this way, courts ensured that there would at least be independent proof of a crime in place before the accused could be convicted of committing it, even if there were no proof apart from the defendant's confession of the defendant's culpability for that crime.  So, for example, under this corroboration rule, a defendant's confession to a homicide could not ground the conviction for that offense unless the government also put forth adequate "tangible evidence of the death of the supposed victim." Wong Sun, 371 U.S. at 489 n.15.

But, while the corroboration rule initially served this important but "extremely limited function," Smith, 348 U.S. at 153, the Supreme Court expanded on it in a trio of cases decided on the same day in 1954.  See Smith, 348 U.S. 147;  Opper v. United

- 12 -

<u>States</u>, 348 U.S. 84 (1954); <u>United States</u> v. <u>Calderon</u>, 348 U.S. 160 (1954).  In so elaborating the rule's scope, the Court broadened it in various ways, some of which have direct bearing on the issues that are before us in this appeal.

First, the Court explained in this trio of cases that, although the corroboration rule was aimed at ensuring that a defendant could not be convicted of committing a crime based simply on his confession when no independent evidence indicated that a crime had been committed at all, the rule also reflected broader concerns about the reliability of certain statements by the accused.  Specifically, the Court described the rule as reflecting the fact that confessions may be unreliable because they are coerced or induced or because, even if not involuntarily made, they might "reflect the strain and confusion attending [an accused's] predicament rather than a clear reflection of his past." <u>Smith</u>, 348 U.S. at 153.  The Court further explained that the requirement that a conviction for a crime like homicide must rest on more than an uncorroborated confession by the accused reflects the fact that the average juror is not familiar with the criminal justice system's long history of false confessions.  <u>Id.</u>

These observations provided background for the Court's clarification in this trio of cases that the scope of the corroboration rule was not limited to "confessions."  To be sure, the Court explained, a confession is a "complete and conscious

- 13 -

admission of guilt," Opper, 348 U.S. at 91, and the corroboration rule historically had been applied to such confessions by the accused. But, the Court held in these cases that the corroboration rule was no less applicable to certain admissions by the accused, even though such statements by the accused are not like a confession because they fail to "admit[] to all the elements of the offense," Smith, 348 U.S. at 154, and may merely "explain actions rather than admit guilt," Opper, 348 U.S. at 91.

The Court described the types of admissions to which the corroboration rule applied as "statements of the accused out of court that show essential elements of the crime . . . necessary to supplement an otherwise inadequate basis for a verdict of conviction." Opper, 348 U.S. at 91. After all, the Court elaborated, these "admissions have the same possibilities for error as confessions." Id. Thus, the Court explained, when an accused's "admission is made after the fact to an official charged with investigating the possibility of wrongdoing, and the statement embraces an element vital to the Government's case," it must be corroborated, just as a confession must be, to provide the necessary evidentiary support to permit a conviction to survive a sufficiency-of-the-evidence challenge. Smith, 348 U.S. at 155.

The Court emphasized, moreover, that a statement by the accused of the sort just described is subject to the corroboration rule even when the admission is not to "one of the formal

- 14 -

'elements' of the crime" but instead only to "a fact subsidiary to the proof of these 'elements,'" Smith, 348 U.S. at 155, that is "essential" to the proof of an element, Opper, 348 U.S. at 90. "It is the practical relation of the statement to the Government's case which is crucial," the Court explained, "not its theoretical relation to the definition of the offense." Smith, 348 U.S. at 155.

In light of this precedent, Cepeda's statement in his interview with the law enforcement agent about the length and nature of his drug use must be corroborated if it is to be relied upon to support his conviction against the sufficiency-of-the-evidence challenge that he brings. For while that admission was not a strict confession, it was made "after the fact to an official charged with investigating the possibility of wrongdoing, and the statement embrace[d] an element vital to the Government's case," id., given that the statement admits to a fact that is vital to the government's effort to prove an element of the offense for which he was convicted -- namely, the "unlawful user" element.

Second, the Court in this trio of 1954 cases clarified the corroboration rule in another respect that bears on Cepeda's sufficiency-of-the-evidence challenge. This clarification concerned the types of offenses to which the corroboration rule applied.

- 15 -

The Court recognized that the corpus delicti for some offenses -- unlike the corpus delicti for, say, homicide -- is not "tangible." Smith, 348 U.S. at 154. For example, according to the Court, tax evasion is an offense that lacks a "tangible" corpus delicti, id., because the offense results in no "physical damage to person or property," Wong Sun, 371 U.S. at 489 n.15. The Court then explained that, for offenses of that sort, evidence that would tend to establish the corpus delicti "must implicate the accused," even though evidence that would tend to establish the corpus delicti of offenses that result in physical damage or injury -- such as evidence of the murdered body in a homicide case -- need not. Smith, 348 U.S. at 154.

The Court thus confronted a choice about whether to apply the corroboration rule to this class of offenses. As the Court described that choice, it could either "apply[] the corroboration rule to [these] offense[s] and accord[] the accused even greater protection than the rule affords to a defendant in a homicide prosecution, or . . . find[] the rule wholly inapplicable because of the nature of the offense." Id. (internal citations omitted).

In the end, the Court chose the former path. Id. And, it did so even though it recognized that it was thereby necessarily providing a "broader guarantee" to defendants in cases of crimes lacking a "tangible corpus delicti" than had been granted to defendants accused of crimes that had one. Id. The Court

- 16 -

explained that this "broader guarantee" resulted precisely because the substantial independent evidence needed in such cases to corroborate the admission or confession -- and thus to ensure that a crime had been committed at all -- necessarily would also be evidence "implicat[ing] the accused." Id.

The Court eventually summarized the corroboration rule as it had been elaborated in this trio of 1954 cases in dicta as follows: "[w]here the crime involves physical damage to person or property, the prosecution must generally show that the injury for which the accused confesses responsibility did in fact occur, and that some person was criminally culpable." Wong Sun, 371 U.S. at 489 n.15. And, "in such a case," the Court went on, "[t]here need . . . be no link, outside the confession, between the injury and the accused who admits having inflicted it." Id.; see also Smith, 348 U.S. at 153-54 (recognizing that for crimes producing physical injuries, "[o]nce the existence of the crime was established . . . the guilt of the accused could be based on his own otherwise uncorroborated confession").

But, by contrast, the Court further explained in that dicta, "where the crime involves no tangible corpus delicti," then "the corroborative evidence must implicate the accused in order to show that a crime has been committed." Wong Sun, 371 U.S. at 489 n.15 (second quotation quoting Smith, 348 U.S. at 154). For, in a case of that type, the only evidence that could corroborate the

fact that a crime was committed at all -- according to the Court -- is evidence that tends to prove that the defendant committed it.  Smith, 348 U.S. at 154.  And so, the Court has made clear that, at least in cases of that type, "[a]ll elements of the offense must be established by independent evidence or corroborated admissions."  Id. at 156.

The Court's guidance in the trio of 1954 cases about the scope of the offenses to which the corroboration rule applies is of direct relevance to Cepeda's sufficiency-based challenge to his conviction.  That is so because the conviction that he challenges under the corroboration rule is for a status-based, firearms possession offense.  Thus, like the crime of tax evasion at issue in Smith, it is a crime that has no "tangible corpus delicti." Wong Sun, 371 U.S. at 489 n.15 (emphasis added) (citing Smith, 348 U.S. at 154).  In consequence, even though any evidence that would tend to establish the corpus delicti for that offense "must implicate" Cepeda in its commission, Smith, 348 U.S. at 154, the government must corroborate the admission that he made about the nature and duration of his drug use if it wishes to rely on that admission to support the "unlawful user" element of the status-based firearms possession offense of which he was convicted, see id. at 154-56.

Finally, the Court in this trio of cases addressed one other issue that bears on Cepeda's evidentiary sufficiency

- 18 -

challenge to his conviction.  That issue concerns the means through which the government may corroborate an admission in a case in which there is no tangible corpus delicti for the underlying offense.

Notably, the Court made clear in the trio of 1954 cases that "the corroborative evidence [for the admission] need not be sufficient, independent of the statements, to establish the corpus delicti."  Opper, 348 U.S. at 93.  Thus, there is no requirement for the government to put forth "substantial evidence . . . which tends to establish the whole of the corpus delicti" directly.  Id. (emphasis added).  For example, corroboration may be shown even if the "direct corroborative evidence . . . tends to establish . . . one element of the offense" and the other elements are proven "entirely by independent evidence," so long as the evidence as a whole, including any corroborated admissions, is "sufficient to find guilt beyond a reasonable doubt."  Id. at 93-94 (emphasis added).

The Court also made clear that, while there must be "substantial independent evidence that the offense has been committed," that substantial independent evidence may include evidence that "merely fortifies the truth of the confession" or admission.  Smith, 348 U.S. at 156.  Thus, evidence that would not, absent the confession or admission, "independently establish[] the crime charged," may nonetheless corroborate the

- 19 -

admission or confession.  Id.  For that reason, the independent evidence that corroborates the essential fact that has been admitted may take the form of evidence that "bolster[s] the [admission] itself and thereby prove[s] the offense 'through' the statements of the accused."  Id. (emphasis added).

The Court had no occasion in Opper, Smith, and Calderon to address in full, however, the types of independent evidence that could be relied upon to bolster such an admission, such that the offense may be proved through that corroborated admission. The Court was asked in each of those cases to find the admission or confession at issue corroborated only based on evidence that tended to show that the content of the relevant portions of the admission or confessions was actually true, or that the alleged crime had actually occurred.  Smith, 348 U.S. at 157-59; Opper, 348 U.S. at 93-94; Calderon, 348 U.S. at 164-168.  The Court had no need, therefore, to address when or whether independent evidence that directly tended to confirm only admitted facts other than the "vital" fact in dispute could render trustworthy the admission of that essential fact, notwithstanding the absence of any independent evidence that directly tended to establish it.[1]

---

[1]  In Smith, for instance, the government successfully corroborated admissions of the defendant's net worth -- a key fact in his prosecution for tax evasion -- both by "substantiating [his] opening net worth directly" and by presenting "independent evidence . . . which tends to establish the crime of tax evasion."

In _Massei_ v. _United States_, however, we rejected the notion that, under the corroboration rule as developed in the trio of 1954 cases, the government could corroborate an admission concerning such a vital fact merely through independent evidence that corroborates a different fact that the accused had admitted, regardless of the relation between that corroborated fact and the vital one that was disputed. 241 F.2d 895, 904 (1st Cir. 1957), aff'd, 355 U.S. 595 (1958). _Massei_ was a case about tax evasion, and we held there that the defendant's admission that he had taken in graft (which was alleged to be the source of his potentially reportable income) was not sufficiently corroborated by "the fact that [the defendant] was proved to have been a police officer as stated in his admissions." _Id._ We explained that the independent

348 U.S. at 157-59. The government thus did not attempt to argue that -- and, in consequence, the Court had no occasion to consider whether -- the net worth admission was trustworthy because, for example, other of his financial disclosures were shown to be accurate. Stating that corroboration can "prove the offense 'through' the statements of the accused," _Smith_, 348 U.S. at 156, the Court cited by "_cf._" and without explanation to _Parker_ v. _State_, 88 N.E.2d 556 (Ind. 1949), _reh'g denied_, 89 N.E.2d 442 (Ind. 1950), in which the Indiana Supreme Court held that "the corroboration required is not of incidental facts stated in the confession but that the offense charged had been committed." _Parker_, 88 N.E.2d at 558. In other words, the corroboration could not merely tend to support the credibility of the confession if it did not also tend to show the existence of a crime. _Id._ at 559-60.

evidence that tended to establish the police officer aspect of the defendant's admission "f[ell] short of . . . corroboration" of the admission that concerned his taking in graft, as there was no "evidence of actual graft taking or opportunity for such." Id.[2]

Nor do we understand our most recent decision in United States v. Singleterry to require us to take a contrary approach to the corroboration rule than the one Massei took. See 29 F.3d 733 (1st Cir. 1994). In Singleterry, we considered a sufficiency challenge by a defendant who had admitted to, and been convicted of, carrying a gun in connection with a drug trafficking offense. Id. at 735-36. Without mentioning Massei, we stated in a footnote that, "in the absence of independent evidence of the corpus delicti," an admission may be corroborated by "other evidence typically used to bolster the credibility and reliability of an out-of-court statement." Id. at 737 n.3. We further concluded -- in dicta in a separate footnote -- that corroborated evidence of the defendant's admitted drug trafficking was "strong evidence"

---

[2] Upon appeal, the Supreme Court rejected our contention that what the graft admission was introduced to demonstrate -- the "likely source" of the defendant's increased net worth -- was an "indispensable element" of the crime of tax evasion under the net worth method of proving evasion, as the government could alternatively demonstrate that no possible source of nontaxable income existed. United States v. Massei, 355 U.S. 595, 595 (1958). Nevertheless, the Court affirmed without disagreeing with our discussion of what would be required to corroborate that admission. Id.

- 22 -

of the trustworthiness of the defendant's further admission that he had used a firearm that had been found in connection with the trafficking.  Id. at 738 n.5.

But, we do not understand that conclusion concerning two types of conduct that have long been thought to be associated with one another -- drug trafficking and firearms usage in furtherance of the trafficking  -- to suggest that Massei erred in declining to treat a corroborated admission as necessarily rendering trustworthy an unrelated one not otherwise corroborated.  The Court has noted that questions of corroboration are necessarily fact-dependent, see Opper, 348 U.S. at 93, and, given the particular facts at issue in Singleterry, and the oft-remarked-upon connection between firearms and drug trafficking, see, e.g., United States v. Bianco, 922 F.2d 910, 912 (1st Cir. 1991) ("[W]e often observe that firearms are common tools of the drug trade . . . ."), we do not read the dicta in Singleterry to hold that independent evidence that tends to establish a fact that has been admitted renders trustworthy all other facts admitted by the accused, no matter how unrelated to each other they may be, even though no independent evidence tends to establish those facts directly.  See also United States v. Deville, 278 F.3d 500, 506-07 (5th Cir. 2002) (finding a defendant's admission to carrying a gun in connection with drug trafficking corroborated by extensive evidence that the defendant engaged in drug trafficking); cf.

- 23 -

<u>United States</u> v. <u>Brown</u>, 617 F.3d 857, 863 (6th Cir. 2010) (deeming a defendant's admission to committing a burglary and possessing a gun stolen in that burglary corroborated by independent evidence that the gun was stolen in that burglary).

Indeed, we note that, in accord with <u>Massei</u>, other circuits have declined to apply the corroboration rule in such a mechanical fashion, whereby independent evidence that tends to establish a fact in an accused's admission may suffice to corroborate an otherwise unrelated vital fact that the admission also contains on the theory that the defendant's corroborated admissions permit the conclusion that he is generally reliable. See <u>United States</u> v. <u>Stephens</u>, 482 F.3d 669, 673 (4th Cir. 2007) (finding a defendant's confession uncorroborated despite testimony demonstrating that a person described in the confession existed and owned the car described by the defendant); <u>United States</u> v. <u>Calhoun</u>, No. 92-2001, 1993 WL 280324 at *3 (6th Cir. July 26, 1993) (per curiam) ("Nor do we believe that the fact the other crimes admitted to in the confession are corroborated permits the use of the confession to prove an uncorroborated crime."); <u>United States</u> v. <u>Lopez-Alvarez</u>, 970 F.2d 583, 595 (9th Cir. 1992) (holding that a defendant's admission that he helped a murderer avoid capture at an airport was uncorroborated where "[t]he only elements of [it] that have been independently verified are those relating to his presence at the airport" and rejecting as insufficient the

government's evidence that other unrelated admissions of the defendant "appear[ed] trustworthy").

This guidance about the means by which admissions may be corroborated directly bears on Cepeda's case, because the government does not contend that substantial independent evidence directly corroborates all parts of his admission. The government does argue that we may treat the evidence in the record of Cepeda's recent drug possession -- namely, the drugs found in his shoe on the day of his arrest -- as corroborative of his admission of his _recent_ drug use, although we note that the caselaw is not consistent in its treatment of whether such evidence can corroborate such an admission. Compare United States v. Sperling, 400 F. App'x 765, 768 (4th Cir. 2010) (concluding that a canine alert may have provided some evidence of drug possession but did not sufficiently corroborate a defendant's admission that he was an unlawful user), with United States v. Mashore, 346 F. App'x 934, 935 (4th Cir. 2009) (per curiam) ("[T]he strong odor of marijuana that [a police officer] observed while standing outside [the defendant's] vehicle . . . was sufficient to justify an inference by the fact-finder that [his] confession about his marijuana use was true.").[3]

---

[3] We do not endorse Sperling's suggestion that evidence of drug possession "is quite irrelevant to the issue of drug use." 400 F. App'x at 768.

But, the government does not argue that there is any independent evidence in the record that in and of itself tends to establish that he was a long-term drug user, as the government has sometimes offered in other cases in which courts have found admissions that pertain to the "unlawful user" element to have been corroborated. See, e.g., United States v. Dalhouse, 534 F.3d 803, 807 (7th Cir. 2008) (finding an "unlawful user" admission corroborated by witness testimony that the defendant was a long-term user). But see United States v. Soltani, 360 F. App'x 694, 696 (8th Cir. 2010) (concluding, without significant explanation, that evidence relating only to recent use corroborated a confession to being a regular, long-term user); Mashore, 346 F. App'x at 935-36 (similar). Notably, for example, the government conceded at oral argument that the marijuana found on Cepeda did not directly tend to establish the length of his drug use.

Instead, the government seeks to fortify the reliability of Cepeda's statement concerning the nature and duration of his past drug use solely by pointing to evidence that provides independent support for finding the content of other statements that Cepeda offered in the same twenty-to-twenty-five-minute interview to be true. In addition to his admission to drug use on the day of the offense, Cepeda stated that he was present in the gray Yaris during the shootout, that his escape was into the Jeep, and that he possessed an automatic weapon and concealed a pistol

- 26 -

magazine. The government asserts -- and Cepeda does not dispute -- that substantial independent evidence does tend to establish, in and of itself, each of those statements. The government then further asserts that, in consequence, we may treat his admission concerning the regular and long-term nature of his drug use as reliable, given that the reliability of his other statements has been adequately demonstrated even though it does not argue that any of the evidence that corroborates those admissions constitutes evidence that in and of itself tends to establish that Cepeda was a long-term user of drugs.

Thus, we now consider the record evidence of corroboration and the government's case that it suffices here. In doing so, we emphasize that the need for there to be substantial independent evidence to corroborate Cepeda's admission bearing on his status as an "unlawful user" is particularly clear, because the circumstances in which Cepeda is said to have made the admission bear strong "indicia of unreliability." Smith, 348 U.S. at 159.

Cepeda's statement pertained to the most disputed element of the crime, the length of time he had used drugs. That element is also one that is unusually difficult to prove absent an admission, as it requires evidence of regular illegal activity over a long period of time. In addition, the interview with Cepeda in which he made the admission was not videotaped or recorded.

Nor were any supporting notes of the interview submitted. Instead, one of his interviewers, Homeland Security Investigations Task Force Agent Carlos Concepcíon-Ramos ("Concepcíon"), testified at trial based solely on his memory of Cepeda's statements. Moreover, while Concepcíon testified that he understood Cepeda to have admitted to being an unlawful user, his testimony revealed that Cepeda's actual words -- "hacía tiempo" -- are susceptible to multiple understandings, some of which would not clearly establish the length of Cepeda's drug usage. See Calderon, 348 U.S. at 164 (carefully scrutinizing an admission for corroboration where the meaning of an "oral statement" at issue was "certainly not clear").

**2.**

We begin with the independent evidence in this case that corroborates Cepeda's admissions concerning the vehicles he was in during the shootout. We do not see how this independent evidence concerning the day of his arrest suffices to corroborate Cepeda's admission that he regularly used drugs over a long period of time. There is too little relationship between the admitted fact that is directly confirmed by independent evidence and the admitted fact for which there is none. And, the absence of any such relationship is especially problematic given the strong indicia of unreliability present here.

For similar reasons, we conclude that Cepeda's admissions concerning firearms do not require a different

- 28 -

conclusion. For while those admissions are also confirmed by independent evidence, as Cepeda himself accepts, his connection to firearms bears no relationship to any past, regular drug use on his part. Nor does the government contend otherwise. This is not a case, for example, like Singleterry in which the admissions -- corroborated and uncorroborated, respectively -- concern conduct that has a well-known relationship. For while a corroborated admission of being a drug trafficker may suffice to render trustworthy an uncorroborated admission of using a firearm to carry out that unlawful trade, there is no similarly established connection between regular long-term drug use and firearms possession. Nor does the government argue otherwise.

Of course, Cepeda did also admit to recent drug use, as he admitted to using marijuana on the day of his arrest. But, even if we were to treat that admission concerning recent drug use as if it were corroborated by the evidence of his recent drug possession, as would seem plausible, but see Sperling, 400 F. App'x at 768 (finding that evidence of current possession does not corroborate an admission of recent use), there is still a substantial temporal gap between the conduct admitted to in his statement about his recent use of drugs and the conduct admitted to in his statement about whether he was a regular, long-term user, cf. Calderon, 348 U.S. at 164 (holding that evidence that the defendant was poor at one point in time was "too remote" to

corroborate an admission relating to his wealth a decade later). Without purporting to identify precisely how long such drug use must have occurred to qualify, we note that the government points us to authority finding a defendant to have been an "unlawful user" only on the basis of evidence that he had used drugs for at least a year. See United States v. Burchard, 580 F.3d 341, 352-54 (6th Cir. 2009) (affirming a conviction under § 922(g)(3) where evidence showed the defendant had used cocaine over a one-year period).

Moreover, we emphasize, the government conceded at oral argument that it is not contending that the evidence of Cepeda's recent drug use in and of itself tends to establish that he used drugs over the extended period of time required by the statute. Rather, the government argues only that the evidence corroborating that admission about recent drug use, along with the evidence corroborating Cepeda's other admissions unrelated to his admission concerning his past drug use, suffices to corroborate that admission by revealing him to be generally reliable in his admissions. See United States v. Jones, 232 F. Supp. 2d 618, 622 (E.D. Va. 2002) (finding a defendant's admission to being an "unlawful user" uncorroborated where the government's corroboration merely verified "peripheral facts unrelated to the crime in prosecution").

Nor do we see how the fact that independent evidence corroborates each of these various admissions -- concerning, respectively, the cars that Cepeda was in during the shootout, the firearms that he possessed during it, and his recent drug use -- requires a different conclusion. The government provides us with no argument as to why the confirmation of any of these admissions is particularly probative of the key unconfirmed admission to being a regular, long-term user. Thus, even when considered together, the government advances no argument as to why there is more than a remote relationship between these corroborated facts and the "essential" fact that is in dispute: whether Cepeda was a long-term, regular drug user, given that such conduct necessarily had to occur well before the shootout. Yet, the precedent is clear that each essential fact that is admitted must be corroborated in order for the offense to be proved through the admission of such a fact.

We emphasize, again, that the interview in which the defendant made the critical admission was not documented at all in the two years prior to trial and the admission itself was unusually ambiguous as to a key element of the offense. The jury therefore had no basis to make an independent assessment of the conditions and context under which Cepeda admitted to being a regular, long-term drug user and therefore no basis to conclude that Cepeda's admission was untainted by pressure or coercion. If Cepeda's

- 31 -

admission had fewer indicia of unreliability, then the jury might have had a greater ability to assess the admission's credibility. There thus might in such circumstances be a correspondingly lesser amount of corroboration required on sufficiency review.

Thus, mindful of these indicia of reliability and that "[e]ach case has its own facts admitted and its own corroborative evidence," Opper, 348 U.S. at 93; see also Smith, 348 U.S. at 156 (recognizing "differing views on the substantiality of specific independent evidence"), we conclude that the evidence that the government identified as sufficient to corroborate Cepeda's statement that he had used drugs over a long period of time is not adequate to do so. Accordingly, we conclude that Cepeda's conviction on Count One rested on an uncorroborated admission and thus must be reversed because it is not supported by sufficient evidence.[4]

### B.

We next consider Tanco's challenge to his § 922(g)(1) conviction. Under 18 U.S.C. § 922(g)(1), it is "unlawful for any person . . . who has been convicted in any court of, a crime

---

[4] Cepeda also asserts that the government's evidence, even if sufficiently corroborated, does not establish that his drug use took place over a long period of time. Because we resolve the first argument in his favor, we need not address the second.

punishable by imprisonment for a term exceeding one year . . . to . . . possess in or affecting commerce, any firearm or ammunition."

Tanco stipulated that he was a felon. He challenges only the possession element of the offense. "Possession can be either actual or constructive, sole or joint." United States v. Wight, 968 F.2d 1393, 1397 (1st Cir. 1992). "Constructive possession of a firearm may be established when a person 'knowingly has the power and intention at a given time of exercising dominion and control over [it] either directly or through others.'" United States v. Ridolfi, 768 F.3d 57, 61-62 (1st Cir. 2014) (quoting United States v. McLean, 409 F.3d 492, 501 (1st Cir. 2005)).

Constructive possession can be inferred, moreover, from circumstances "such as a defendant's control over the area where the contraband is found (e.g., defendant's home or automobile)." Id. at 62 (quoting McLean, 409 F.3d at 501). Thus, constructive possession may be proven "through the use of either direct or circumstantial evidence; however, mere presence or association with another who possessed the contraband is insufficient to establish constructive possession." Wight, 968 F.2d at 1397. Put otherwise, "there must be some action, some word, or some conduct that links the individual to the contraband and indicates that he had some stake in it, some power over it." McLean, 409 F.3d at 501 (alterations and internal quotations omitted).

Tanco contends that there was insufficient evidence of either his actual or his constructive possession of a firearm. We disagree.

The evidence supportably shows that Tanco was involved in a drive-by shooting and that, during it, he was driving the gray Yaris that was involved in that shooting. The evidence also supportably shows both that he was in an apartment where officers found a pistol in a laundry bag and a pistol magazine under the table and that two other firearms were found near the Jeep from which he and his co-defendants exited during the police chase. Furthermore, the evidence suffices to show that shell casings from each of these three firearms were found at the site of the shooting.

Viewing the evidence in the light most favorable to the verdict, a jury could reasonably find that all three firearms were used during the shooting. The evidence concerning the shell casings, when considered with other evidence just reviewed, suffices to establish as much. Given that the evidence also supportably shows that Tanco participated in the entirety of the drive-by shooting and police chase along with the other two co-defendants, the evidence suffices to permit a reasonable jury to find that he had or could have exercised control over at least one of the three firearms during the course of those events. See Wight, 968 F.2d at 1398 (finding that "it could be inferred from

- 34 -

[the] fact" that the defendant was in the vehicle for the purpose of committing a crime that "he, as a convicted felon, exercised joint dominion or control over the vehicle and its contents, including the firearm"). Therefore, we affirm Tanco's conviction on Count Two.

## c.

We next turn to Tanco's and Rosario's challenges to their § 922(o) convictions of aiding and abetting in the possession of a machinegun. On appeal, Cepeda does not contest his conviction as to Count Three. Therefore, we affirm.

Under 18 U.S.C. § 922(o), it is "unlawful for any person to transfer or possess a machinegun," setting aside certain enumerated exceptions that do not apply here. To establish a violation of § 922(o), "the government must prove that 1) the defendant possessed or transferred a machinegun 2) with knowledge that the weapon had the characteristics to bring it within the statutory definition of a machinegun." United States v. Olofson, 563 F.3d 652, 659 (7th Cir. 2009). "A machine gun is defined as 'any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.'" United States v. Nieves-Castano, 480 F.3d 597, 599 (1st Cir. 2007) (quoting 26 U.S.C. § 5845(b)).

With regard to the knowledge requirement, the government must prove that "the defendant had knowledge of the characteristics that brought the gun within the statutory definition, and not that []he had knowledge that the gun was in fact considered a machine gun under law." Id. "The requisite mens rea may be established by circumstantial evidence," which includes "external indications signaling the nature of the weapon." Id. at 601 (quoting Staples v. United States, 511 U.S. 600, 615 n.11 (1994)).

At trial, the District Court instructed the jury, with respect to this offense, about aiding and abetting liability. "Aiding and abetting requires that 'the defendant [have] associated himself with the venture, participated in it as in something he wished to bring about, and sought by his actions to make it succeed.'" United States v. Luciano-Mosquera, 63 F.3d 1142, 1149–50 (1st Cir. 1995) (alteration in original) (quoting United States v. Alvarez, 987 F.2d 77, 83 (1st Cir.), cert. denied, 510 U.S. 849 (1993)). "Mere association with the principal, or mere presence at the scene of a crime, even when combined with knowledge that a crime will be committed, is not sufficient to establish aiding and abetting liability." Id. at 1150.

The Supreme Court has held that aiding and abetting liability requires the government to show that the defendant had "advance knowledge" of the elements of the offense. Rosemond v.

- 36 -

United States, 572 U.S. 65, 78 (2014). Advance knowledge "means knowledge at a time the accomplice can do something with it -- most notably, opt to walk away." Id.; see United States v. Rodríguez-Martinez, 778 F.3d 367, 371 (1st Cir. 2015).

The government contends that the evidence sufficed to show that Tanco and Rosario aided and abetted Cepeda's possession of the machinegun, given the evidence that showed their joint involvement in the drive-by shooting and Cepeda's admission that he possessed the machinegun during that incident. Tanco and Rosario, however, argue that the government failed to prove that they had advance knowledge of the characteristics of the machinegun and thus that the evidence did not suffice to establish that they aided and abetted Cepeda in the possession of the machinegun. We are not persuaded.

It is true that the government presented no evidence that Tanco and Rosario knew of the pistol's machinegun capabilities until the point at which Cepeda began firing. But, the government did introduce evidence from which a jury could reasonably find that Tanco and Rosario were with Cepeda during the drive-by shooting and that they each heard a rapid round of shots being fired that was consistent with the firing of a machinegun. Taking the evidence of the rapid firing of the machinegun in the light most favorable to the verdict, a jury could reasonably find beyond a reasonable doubt that Tanco and Rosario knew that the pistol

that was being fired was a machinegun. See Staples, 511 U.S. at 615 n.11 ("[K]nowledge can be inferred from circumstantial evidence, including any external indications signaling the nature of the weapon. And firing a fully automatic weapon would make the regulated characteristics of the weapon immediately apparent to its owner.").

Thus, the only question is whether Tanco and Rosario had a "realistic opportunity to quit the crime" after the point at which the jury could reasonably find that they knew the pistol was a machinegun. United States v. Manso-Cepeda, 810 F.3d 846, 849 (1st Cir. 2016) (internal quotations omitted). For, if they did not have such an opportunity, then "the defendant has not shown the requisite intent to assist a crime involving a gun." Id. (internal quotations omitted).

The Supreme Court has made clear that "if a defendant continues to participate in a crime after a gun was displayed or used by a confederate, the jury can permissibly infer from his failure to object or withdraw that he had such knowledge. In any criminal case, after all, the factfinder can draw inferences about a defendant's intent based on all the facts and circumstances of a crime's commission." Rosemond, 572 U.S. at 78 n.9. Tanco and Rosario "do[] not adequately explain why it was too late to withdraw." Manso-Cepeda, 810 F.3d at 851. Thus, they have failed

to provide a basis for overturning their convictions for violating § 922(o) on sufficiency grounds.[5]

### III.

Finally, we address the reasonableness of Cepeda's and Tanco's challenges to their sentences. Cepeda and Tanco both challenge the procedural and substantive reasonableness of their sentences.

Our first task is to determine whether the District Court made any procedural errors "such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the [18 U.S.C.] § 3553(a) factors, selecting a sentence based on clearly erroneous

---

[5] Rosario also argues for the first time on appeal that the jury instructions related to illegal possession were erroneous because they "failed to require that Rosario[] knew in advance that one of his codefendants would be armed." The government argues that any such argument is waived because Rosario neither raised an objection to the instructions below nor adequately developed his argument on appeal. See United States v. Soto, 799 F.3d 68, 96 (1st Cir. 2015); United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). In any event, Rosario's argument has no merit, because the jury instructions specifically required "that the charged defendants consciously shared advance knowledge of the person's possession of the machine gun and advance knowledge of the characteristic that made the weapon a machine gun, intended to help each other, and took part in the endeavor seeking to make it succeed." (Emphasis added); see Rosemond v. United States, 572 U.S. 65, 78 (2014) (holding that "advance knowledge" is "knowledge that enables [the defendant] to make the relevant legal (and indeed, moral) choice," including to "withdraw from the enterprise").

facts, or failing to adequately explain the chosen sentence --
including an explanation for any deviation from the Guidelines
range." Gall v. United States, 552 U.S. 38, 51 (2007). Generally,
procedural errors in sentencing are reviewed for an abuse of
discretion. United States v. Dávila-González, 595 F.3d 42, 47
(1st Cir. 2010). If there are no procedural errors, we then review
the substantive reasonableness of the sentence for an abuse of
discretion. United States v. Pantojas-Cruz, 800 F.3d 54, 58-59
(1st Cir. 2015).[6]

**A.**

We begin by reviewing what happened at sentencing. We
start by reviewing the pre-sentence reports ("PSRs") that the
United States Probation Officer prepared for Tanco and Cepeda's
cases.

Tanco's and Cepeda's PSRs highlighted that, on the date
of the events in question, gunfire was heard by witnesses and the
two defendants "were seen leaving the scene in a wine Jeep Cherokee
where the body of Juan R. Delgado-Rodríguez was found." Because

---

[6] The government asserts that because Tanco did not argue that
the 120-month prison sentence was substantively unreasonable after
it was imposed, we should review on plain error. However, "the
applicable standard of review for an unpreserved, substantive
reasonableness challenge is murky." United States v. Arsenault,
833 F.3d 24, 29 (1st Cir. 2016)(internal quotations omitted).
Thus, we will apply the more defendant-friendly abuse of discretion
standard of review.

the PSRs concluded that Cepeda and Tanco had committed their firearms crimes in connection with the murder of Delgado, the PSRs recommended a base offense level ("BOL") of 43 for first degree murder under U.S.S.G. § 2A1.1, as U.S.S.G. § 2K2.1(c)(1)(B) requires the application of the most analogous homicide cross-reference if firearms or ammunition were used or possessed in connection with a death.

Cepeda had a Criminal History Category ("CHC") of I and Tanco had a CHC of II. The PSRs accordingly calculated that the guidelines would recommend a sentence of life imprisonment. However, 18 U.S.C. §§ 922(g)(1), 922(g)(3), and 922(o) do not carry life sentences. See 18 U.S.C. § 924(a)(2). The PSRs therefore recommended a guidelines range of the statutory maximum prison sentence: 120 months', or 10 years', imprisonment as to both Tanco and Cepeda.

Cepeda and Tanco objected to the PSRs' application of the murder cross-reference. The defendants each pointed to an alleged lack of evidence to support its application. After all, they noted, the District Court expressly prohibited any discussion of the murder of Delgado, as it was being handled in the Commonwealth's local courts.

Absent the application of the murder cross-reference, Cepeda and Tanco argued, the proper BOL for each of them under U.S.S.G. § 2K2.1(a)(4)(B) was 20, because their offenses involved

- 41 -

a machinegun and because, according to the jury verdict, they were prohibited persons at the time of the offense under § 922(g)(3) and § 922(g)(1), respectively.[7]  Tanco argued that, with a BOL of 20 and a CHC of II, his sentencing range should be 37-to-46 months' imprisonment.  Cepeda argued that with a CHC of I and a BOL of 20, his guidelines range was 33-to-41 months' imprisonment.

At the sentencing proceeding, the District Court made a number of findings regarding Cepeda and Tanco's participation in the murder of Delgado.  The District Court correctly determined that it needed only to find by a preponderance of the evidence that they had participated in that murder in order to apply the murder cross-reference.  See United States v. Rodriguez-Reyes, 714 F.3d 1, 11-14 (1st Cir. 2013).  Nevertheless, the District Court declined to apply the murder cross-reference and the BOL of 43 that would have applied in consequence.

Instead, the District Court agreed with Tanco and Cepeda that a BOL of 20 was appropriate.  The Court's calculation reflected not only the fact that Cepeda and Tanco were convicted of offenses involving a machinegun, which would have resulted in only a BOL of 18 under U.S.S.G. § 2K2.1(a)(5), but also that they were both determined to be prohibited persons, which increased

---

[7] The guidelines define "prohibited person" for the purposes of U.S.S.G. § 2K2.1 as "any person described in 18 U.S.C. § 922(g) or § 922(n)."  U.S.S.G. § 2K2.1 cmt. n.3.

their BOLs to 20 under U.S.S.G. § 2K2.1(a)(4)(B).  The Court then proceeded to apply an additional two-level enhancement pursuant to U.S.S.G. § 2K2.1(b)(1)(A), because their offenses involved three or more firearms, for a total offense level ("TOL") of 22.  Because neither Cepeda's nor Tanco's requested guidelines calculations reflected this enhancement for multiple firearms, the District Court arrived at higher guidelines ranges than those argued for by the defendants: 41-to-51 months' imprisonment for Cepeda and 46-to-57 months' imprisonment for Tanco.

The District Court first sentenced Cepeda.  It considered a variety of sentencing factors, including his age, education, and use of marijuana.  Regarding Cepeda's participation in the shooting, the District Court concluded that Cepeda had been in the car that had been following the victim and that shots were fired by someone in that car.  The District Court could not determine, however, that Cepeda himself had used a firearm, as it could have been Tanco who fired the shots.

After reviewing the § 3553(a) factors, including the "need for the sentence imposed . . . to protect the public from further crimes of the defendant," see 18 U.S.C. § 3553(a)(2)(C), the District Court imposed a sentence of 120 months of imprisonment each for Counts One and Three -- an upward variance from the guidelines range to the maximum sentence allowed under the statute -- to be served concurrently.  In support of the variance, the

District Court noted its finding that Cepeda had participated in the killing of Delgado. The Court found that the killing was preplanned because the high-speed chase appeared to be highly orchestrated and involved two people -- Cepeda and Tanco -- in the gray Yaris, as well as a third person in the Jeep. The District Court also took note of a cell phone seized near the abandoned Jeep that contained a text message describing someone as being "alone," wearing a black sweater, and having a "spider web tattoo on his hand."

The government suggested that the message supported an inference that the shooting was preplanned because the description in the text message matched Delgado's appearance on the day of the shooting. Although it was unclear to whom the phone belonged or whether Cepeda or Tanco had sent or received the message, the District Court, after considering the § 3553(a) factors, stated that the text message did provide support as to the co-defendants' premeditation to kill the victim, as the message identifying Delgado and claiming that he was alone suggested that the defendants were implementing a plan to commit a murder that had been arranged in advance.

Cepeda objected to the sentence as procedurally and substantively unreasonable. He emphasized that it was more than two times greater than the highest end of the guidelines range and that there was a lack of evidence to establish premeditation or

- 44 -

mens rea.  The District Court disagreed and noted that Cepeda was one of the three people who exited the Jeep after the police chase and that he was found with a loaded magazine nearby.

The District Court next sentenced Tanco.  After hearing about and considering his education level, his upbringing in a dangerous area, and his obligations to his wife and his young children, the Court then decided to apply the same upward variance for Tanco that it had applied for Cepeda because the use of the weapons for which Tanco was being charged resulted in a death.  In arriving at that conclusion, the District Court made similar findings as it did in Cepeda's case, noting as well that Tanco's DNA had been found in the Yaris and that Tanco was eventually found in an apartment where part of a firearm was seized.

**B.**

With that background in place, we first address Tanco's sentencing challenge.  Tanco argues that the District Court committed procedural error by "circumventing the applicable guidelines range and fail[ing] to justify the extent of [its] upward variance."  Specifically, he contends that the District Court erred in relying on a determination that he was involved in Delgado's murder for the upward variance, that his sentence was imposed without the protections afforded by the sentencing guidelines, and that the District Court failed to consider his

mitigating factors. He also challenges the substantive reasonableness of the sentence.

## 1.

With respect to Tanco's challenge to the District Court's consideration of his role in the Delgado murder, the District Court did not find that Tanco committed it. Rather, based on the evidence presented at trial and at sentencing, the District Court found by a preponderance of the evidence that the firearms underlying Tanco and his co-defendants' federal charges were used to kill Delgado, that Tanco was at least associated with the murder, and that the killing was preplanned.

The District Court did not err in doing so. Prior criminal conduct is part of the history and characteristics of the defendant that may be considered at sentencing, see 18 U.S.C. §§ 3553(a)(1), 3661, and may be relevant in particular cases to the factors enumerated in § 3553(a)(2). In making its determination about the sentence to be imposed, moreover, "[a] sentencing court is entitled to rely on circumstantial evidence and draw plausible inferences therefrom." United States v. Marceau, 554 F.3d 24, 32 (1st Cir. 2009) (internal citations omitted). The phone found next to the Jeep, for instance, identified someone resembling the victim, thereby giving rise to the inference that the defendants -- who had recently abandoned that same Jeep -- planned and executed the murder. Thus, the

- 46 -

District Court acted permissibly in giving weight to the evidence concerning the Delgado murder, see United States v. Overstreet, 713 F.3d 627, 638 (11th Cir. 2013) (affirming an above-guideline sentence because the District Court found that the defendant had committed a murder connected to the offense), even though it did not apply the murder cross-reference.

In addition, because the District Court expressly made its findings with respect to Tanco's relationship to that murder under a preponderance of the evidence standard, Tanco's argument that he was sentenced without the procedural protections of the guidelines has no merit.[8]  See United States v. Damon, 595 F.3d 395, 399 (1st Cir. 2010) (holding the government "must show the facts supporting an enhancement by a preponderance of the evidence").

Finally, contrary to Tanco's contention, the District Court did address his mitigating factors.  Although Tanco may not agree with the District Court's weighing of the § 3553(a) factors, "[w]eighing of those factors is left largely within a sentencing court's discretion."  United States v. Gonzalez-Rodriguez, 859 F.3d 134, 140 (1st Cir. 2017).  And while a sentencing court must consider the applicable § 3553(a) factors, it "is not required to

_____

[8] The government asserts that this argument is waived for lack of development.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

address frontally every argument advanced by the parties, nor need it dissect every factor made relevant by . . . § 3553 'one by one, in some sort of rote incantation, when explicating its sentencing decision.'" United States v. Turbides-Leonardo, 468 F.3d 34, 40-41 (1st Cir. 2006) (quoting United States v. Dixon, 449 F.3d 149, 205 (1st Cir. 2006)). Nor is there a "requirement that a district court afford each of the section 3553(a) factors equal prominence." Dixon, 449 F.3d at 205.

**2.**

We turn, then, to Tanco's challenges to the substantive reasonableness of his sentence. He asserts that his sentence was too harsh given his personal characteristics. "But the fact that the court chose to attach less significance to certain mitigating circumstances than [he] thinks they deserved does not make his sentence substantively unreasonable." United States v. Mangual-Rosado, 907 F.3d 107, 111 (1st Cir. 2018) (internal alternations and quotations omitted). "Rather, a sentence is substantively reasonable so long as it rests on a plausible sentencing rationale and exemplifies a defensible result." Id. (internal alternations and quotations omitted). And that is the case here, given the unique features of the case that the District Court highlighted. Therefore, we reject Tanco's substantive reasonableness challenge to his sentence.

# C.

That brings us to Cepeda's challenge to his sentence. Because we have reversed his conviction on Count One, all that remains is his challenge to his sentence on Count Three. Cepeda makes the same arguments that Tanco made regarding the procedural and substantive reasonableness of his sentence. We have already considered these arguments and found them wanting in rejecting Tanco's sentencing challenge. Nevertheless, we vacate and remand Cepeda's sentence on Count Three, in which he was convicted of illegal possession of a machinegun in violation of 18 U.S.C. § 922(o).

As we have noted, the District Court determined that Cepeda's BOL under the guidelines was 20, based in part on a finding that he was a prohibited person at the time that he committed the offense in consequence of his Count One conviction. See U.S.S.G. § 2K2.1(a)(4)(B). With a two-level enhancement for the use of three or more firearms, the District Court found that his TOL was 22, and his guidelines range was therefore 41-to-51 months' imprisonment.

But, as we reverse Cepeda's conviction on Count One for violating § 922(g)(3), that conviction cannot support the District Court's prohibited person finding. Nor did the District Court separately find by a preponderance of the evidence that Cepeda was

- 49 -

such a person, assuming that the record would support such a finding.

Thus, the record does not contain findings that could support the District Court's determination that Cepeda's BOL was 20 -- and thus that his TOL was 22 rather than 20, due to the two-level multiple firearms enhancement. Accordingly, the record lacks the findings that could support the District Court's determination that his guidelines range for his conviction on Count Three is for a sentence of 41-to-51 months' imprisonment rather than, as Cepeda contends, for 33-to-41 months' imprisonment, as would be the case if his TOL were only 20 rather than 22.

The question, then, is whether we must vacate and remand Cepeda's sentence. It is possible the District Court might have arrived at the same 120-month sentence even under the reduced guidelines range. The District Court clearly intended that Cepeda's sentence reflect his ties to the Delgado murder, and it stated both that it was "perform[ing] a variance upward to the highest end of . . . the statute," and that it was going to "make a variant because there's a murder," even if the TOL was only 20. We also recognize that, on remand, the District Court potentially could, under the less demanding "preponderance of the evidence" standard, make an independent determination that Cepeda is an unlawful user and therefore a prohibited person, and still arrive at the same TOL of 22. After all, we are aware of no authority

- 50 -

-- and Cepeda supplies none -- that would indicate that, because the corroboration rule precludes his admission about the nature and duration of his drug use from supporting a jury finding that he was a regular, long-term drug user beyond a reasonable doubt, that admission -- considered in the context of the record as a whole -- could not support a finding at sentencing to that effect under the less onerous preponderance of the evidence standard.

But, the Court relied solely on Cepeda's conviction on Count One in deeming him a prohibited person and thus did not independently make any such finding on that score. Moreover, the record as to whether he is such a person is too uncertain for us to conclude that the District Court's reliance on the now-reversed conviction to calculate the guidelines range was harmless.

Nor can we say it is sufficiently clear that the District Court would have imposed the same upward variance even if the guidelines range were premised on the lower TOL that would apply in the event the District Court did not find Cepeda to be a prohibited person on remand. Even under the more stringent plain error standard, "[w]hen a defendant is sentenced under an incorrect Guidelines range . . . the error . . . most often will[] be sufficient to show a reasonable probability of a different outcome absent the error." Molina-Martinez v. United States, 136 S. Ct. 1338, 1345 (2016).

- 51 -

Here, the District Court began its analysis by calculating the guidelines range. And, while it ultimately imposed a sentence outside that range, the record does not indicate that the guidelines played no role in its decision, or that the District Court would have made the exact same upward variance regardless of the sentencing range set forth in the guidelines. For while the District Court stated that it would impose "a variant" sentence in light of the evidence showing Cepeda's relationship to Delgado's murder, the District Court was not clear in stating that the extent of that variance would necessarily be to the statutory maximum sentence even if the defendant's TOL was lower than the District Court had determined that it was. Accordingly, our reading of the record is that, as is ordinarily the case, the error here was not harmless, as the "judge use[d] the sentencing range as the beginning point to explain [his] decision to deviate from it," and the guidelines were "in a real sense the basis for the sentence." Molina-Martinez, 136 S. Ct. at 1345 (emphasis omitted) (quoting Peugh v. United States, 569 U.S. 530, 542 (2013)).

## IV.

For the above stated reasons, we affirm all three defendants' convictions on Count Three and Tanco's conviction on Count Two. We reverse Cepeda's conviction on Count One. We affirm Tanco's sentence and vacate and remand Cepeda's sentence.