# United States Court of Appeals
## For the First Circuit

No. 10-2294

UNITED STATES OF AMERICA,

Appellee,

v.

NICHOLAS DJOKICH,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark L. Wolf, U.S. District Judge]

Before

Torruella, Lipez, and Howard,
Circuit Judges.

Paul J. Andrews, with whom Elizabeth Billowitz and Denner Pellegrino, LLP were on brief, for appellant.
Robert E. Richardson, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, was on brief, for appellee.

August 29, 2012

**LIPEZ**, **Circuit Judge**.  Appellant Nicholas Djokich was indicted with Eginardo DeAngelis on one count of conspiracy to commit kidnaping in violation of 18 U.S.C. § 1201(a)(1) and (c), and one count of conspiracy to use interstate commerce facilities in the commission of murder for hire in violation of 18 U.S.C. § 1958.  Djokich moved to dismiss the indictment, citing outrageous government misconduct in manufacturing federal jurisdiction.  The district court deferred ruling on the motion to dismiss, and the case proceeded to a fourteen-day trial.  On June 16, 2010, a jury convicted Djokich on both counts.[1]  Two days later, the district court denied the motion to dismiss.  Djokich was sentenced to 240 months' imprisonment, followed by 36 months of supervised release, and fined $25,000.

Djokich timely appeals, arguing that the district court erred in denying his motion to dismiss and in refusing to instruct the jury on the defense of jurisdictional entrapment.  After careful review of the record, we affirm.

**I.**

On the basis of the evidence presented at trial, a reasonable jury could have found the following facts. See Quiles-Quiles v. Henderson, 439 F.3d 1, 3 (1st Cir. 2006).

---

[1] The jury found DeAngelis not guilty on both counts.

-2-

## A. The Embezzlement

The charges against Djokich arose from a plot to kidnap and kill Richard DeVries, a Canadian lawyer who lived in the Bahamas. In March 2007, Djokich called DeVries and told him that he believed some of Djokich's money had gone into DeVries' trust fund through an intermediary, William Lenz, with whom Djokich had invested money. Suspecting that Lenz, DeVries' client, had embezzled money from Djokich, Djokich asked DeVries for the relevant records. After Lenz waived attorney-client privilege, DeVries determined that approximately $284,000 that Djokich had invested with Lenz had been put into the trust fund that DeVries held on Lenz's behalf. DeVries told Djokich that he believed the money had been invested according to Lenz's representations to clients and that he did not think that Lenz had acted inappropriately. However, DeVries also told Djokich that if he felt he had been defrauded, he should contact authorities. DeVries told Djokich that he would cooperate with any official investigation.

## B. Recruiting Accomplices

Nasser Saffiedie, also known as "Victor," is a Lebanese national who immigrated to Canada in 1991. While Saffiedie was working as an informant for U.S. Immigration and Customs Enforcement ("ICE"), he was contacted by Abu Nimer. Saffiedie and Nimer were acquainted from a previous scheme, based in Montreal, in

-3-

which Saffiedie acted as a money launderer. Nimer asked Saffiedie if he knew someone who could help Nimer's "Italian friend," an apparent reference to DeAngelis, by going to the Bahamas, kidnaping a person who had defrauded DeAngelis's friend of $175 million, and forcing that person to repay the money.

Saffiedie agreed to meet Nimer in Montreal on July 3, 2008. The meeting took place at the offices of Reber America, a company owned by DeAngelis. During the meeting, Nimer introduced Saffiedie to DeAngelis and Djokich. Djokich told Saffiedie that he had lost a lot of money in an investment and said that DeVries was responsible. Saffiedie testified that Djokich wanted him to go to the Bahamas and force DeVries to return the money. Saffiedie also said that Djokich told him that "he doesn't mind if Mr. DeVries would go fishing and he never came back." Saffiedie told Djokich that he may know someone who could do the job.

After the meeting, Saffiedie contacted his handler, ICE-Boston Special Agent Derek Dunn, and described the meeting. On July 15, Dunn instructed Saffiedie to tell Nimer that he had someone to do the job. Saffiedie, Nimer, Djokich, and DeAngelis met on July 17, again at Reber America. During the meeting, Saffiedie told the others that he had some men willing to kidnap DeVries. Saffiedie said that the men wanted to meet with Djokich and DeAngelis in Boston.

-4-

## C.  The July 23, 2008, Meeting at Logan Airport

On Dunn's instruction, Saffiedie called Djokich on July 21 and gave him a contact number for "Peter," the man Djokich was to meet in Boston.  The same day, Dunn contacted Peter Pasciucco, a detective with the Massachusetts Bay Transit Authority Police who had worked with ICE for several years.  Dunn told Pasciucco that he would receive a call later that day to set up a meeting with "Nick," later identified as Djokich.  Djokich called Pasciucco that evening and again the following day.

Pasciucco and Djokich met at Logan Airport in Boston on July 23 and spoke in a restaurant there for approximately 70 minutes.  The conversation was recorded by a body wire worn by Pasciucco.  During the conversation, Pasciucco told Djokich that he seemed to have a good legal case against DeVries.  Djokich responded that DeVries was a lawyer and would "tie [him] up [in court] for the next 30 years."  Djokich explained to Pasciucco that he had been defrauded through an investment scam by Lenz, DeVries, and others known as the French men.  Djokich said that Lenz, DeVries, and the others had guaranteed him a safe investment but nevertheless lost all the money that Djokich invested.  Now, Djokich said, he intended to hold the men to their guarantee. Djokich described how he had gone after Lenz a few years earlier but was unable to recover any money after cutting off Lenz's pinky finger because the bank would not complete a transfer of funds

without Lenz physically present.  As to the French men, Djokich said that he would take care of them by "bury[ing] them alive."  Djokich also indicated that he was considering targets in Detroit and London.

Regarding the DeVries plan, Pasciucco said that he could get a boat and kidnap DeVries by taking him on it.  Before doing so, however, Pasciucco said that he wanted to be sure DeVries had access to money in order to avoid the problem Djokich had with Lenz.  Djokich responded that, "[i]f [DeVries] refuses and everything, . . . he swims with the fish.  Simple as that."  In response, Pasciucco said, "You want me to throw him overboard, I'll throw him overboard.  You want me to dust him off and put him back on the pier, I'll do that, too."  Later in the conversation Djokich said about DeVries, "I mean, I know he has the cash.  I know he's hiding it for the other pieces of shit.  And once he disposes of it, maybe dispose of him."  Pasciucco said the treatment of DeVries was up to Djokich, and Djokich responded, "I'm gonna talk to [DeAngelis] about that.  He's got more experience than I do."

During the conversation, Pasciucco asked to be paid a set fee instead of a percentage of what was recovered.  Pasciucco said that he needed $10,000 up front.  Djokich agreed, stating that the money may not come from him but from DeAngelis.  Djokich and Pasciucco agreed to communicate about the logistics of the deal by email.  Pasciucco gave Djokich an email address and password for an

account in which they could communicate privately without using the internet.

**D.  Delivery of $10,000 to Pasciucco**

Between their meeting at the airport and August 11, 2008, Djokich and Pasciucco communicated by email and telephone to arrange delivery of the $10,000 Pasciucco requested up front. At the airport, Pasciucco had suggested meeting at the library in Derby Line, Vermont. In a call on July 29, 2008, Djokich asked Pasciucco to come to Canada instead, but Pasciucco falsely claimed that he had a problem with his passport. At ICE's instruction, Pasciucco suggested by email that they move the meeting "west," by which he meant Burlington, Vermont. Djokich took "west" to mean Calgary and agreed to the change in plans. Pasciucco clarified his intent by phone the following day, and Djokich said that the library was a better option. Pasciucco agreed. However, on August 10, 2008, "Al," an associate involved in the delivery, told Pasciucco that it would be simpler for the meeting to take place in the Burlington area. On August 11, Al, DeAngelis and two others drove to meet Pasciucco in a parking lot in Williston, Vermont. At the meeting, Al gave Pasciucco a bag containing $10,000 in cash. Djokich was not present.

**E.  The October 15, 2008, Meeting at Logan Airport**

After the cash exchange, Pasciucco and Djokich continued to communicate about details of the deal by email and telephone.

In mid-August, Pasciucco told Djokich by email that he was doing the job in Florida because the Bahamas presented too many issues. Djokich told Pasciucco that it was "[his] call." Over the phone on August 25, Pasciucco specified that they were doing the job in South Florida. Djokich replied, "Okay." Pasciucco also suggested a final pre-job meeting in Boston to which Djokich agreed.

Pasciucco and Djokich arranged to meet at Logan Airport on October 15, 2008. During the meeting, they discussed the plot generally as well as DeVries' fate. Pasciucco said, "[T]he second issue is, dead or alive?" Djokich said that "[DeAngelis] wants him, um, wiped out." Pasciucco pressed for Djokich's opinion, saying that he worked for Djokich not DeAngelis. Djokich said, "I know, I know. But [DeAngelis] told me he wants [DeVries] done." Pasciucco pressed Djokich further, confirming with Djokich that "both of youse are saying kill him." Djokich clarified, "[T]hat's [DeAngelis's] orders. . . . I asked him. I said, Angelo, you're calling the shots, what [do] you want to do. . . . And this is what he wants to do." Pasciucco said that he may kidnap DeVries the following Monday and sought confirmation about his orders: "So the two guys that are in charge of this are saying kill him?" Djokich replied, "[O]ne guy is [DeAngelis]. He's saying wipe him out."

Over the course of the conversation, Djokich also indicated to Pasciucco that he had "a couple of [additional] jobs"

for Pasciucco.  Djokich told Pasciucco about his displeasure with another unidentified man, saying he did not know "where to do it, either in Montreal or . . . Jersey."

Djokich was arrested three days later, on October 18, 2008, when he arrived at Los Angeles International Airport for business unrelated to this case.

**II.**

Djokich makes two arguments on appeal.  Both depend on essentially the same contention: the government created United States jurisdiction by unlawfully orchestrating a change in location for the crimes that Djokich conspired to commit. Specifically, Djokich claims that the conspiracy in which he was engaged did not contemplate the commission of crimes in the United States before the government took purposeful steps to ensure that those crimes were moved from the Bahamas to the United States, thereby creating federal jurisdiction.  Djokich argues that the district court erred by denying his motion to dismiss, which alleged that the government's efforts to manufacture federal jurisdiction constituted outrageous misconduct, thereby mandating dismissal of the indictment under the outrageous misconduct doctrine.[2]  Djokich also challenges the district court's failure to

---

[2] The indictment charged Djokich and DeAngelis with one count of conspiracy to commit kidnaping in violation of 18 U.S.C. § 1201(a)(1) and (c), and one count of conspiracy to use interstate commerce facilities in the commission of murder for hire in violation of 18 U.S.C. § 1958.  A person violates 18 U.S.C. § 1201

-9-

give a jury instruction explaining his jurisdictional entrapment

theory of defense.[3]

_____

if he or she

> (a) . . . unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof, when--
>
>> (1) . . . the offender travels in interstate or foreign commerce or uses the mail or any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense; . . . [and]
>
> (c) If two or more persons conspire to violate this section and one or more of such persons do any overt act to effect the object of the conspiracy, each shall be punished by imprisonment for any term of years or for life.

A person violates 18 U.S.C. § 1958 if he or she

> (a) . . . travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, or uses or causes another (including the intended victim) to use the mail or any facility of interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or . . . conspires to do so . . . .

[3] In his appellate briefing, Djokich uses the term "manufactured jurisdiction" when discussing the motion to dismiss and the term "entrapment-based manufactured jurisdiction instruction" when discussing his proposed jury instruction. In the district court, Djokich labeled his proposed instruction "jurisdictional entrapment." For clarity here, we use the term "manufactured jurisdiction" in discussing Djokich's motion to dismiss argument and "jurisdictional entrapment" in discussing his jury instruction argument.

## A.  Manufactured Jurisdiction

We review de novo the district court's conclusion that the government did not engage in misconduct sufficient to warrant dismissal of the charges. United States v. Guzman, 282 F.3d 56, 58 (1st Cir. 2002).  In order to rule on the motion to dismiss the indictment, the district court made certain findings of fact based on the evidence presented at trial.  We review those findings for clear error.  Id.

### 1.  Background

In limited circumstances, courts may dismiss criminal charges in response to outrageous government misconduct:

> In rare and extreme circumstances, a federal court has the authority to dismiss criminal charges as a sanction for government misconduct.  But the law frowns on the exoneration of a defendant for reasons unrelated to his guilt or innocence, and, accordingly, the power to dismiss charges based solely on government misconduct must be used sparingly.  It follows that the outrageous government misconduct doctrine is reserved for the most appalling and egregious situations. At the very least, the defendant must show that the challenged conduct violates commonly accepted norms of fundamental fairness and is shocking to the universal sense of justice.

Guzman, 282 F.3d at 59 (citations omitted); see also United States v. Luisi, 482 F.3d 43, 59 (1st Cir. 2007) ("While the doctrine is often invoked by criminal defendants, it has never yet been successful in this circuit.").  Dismissal may be proper, however, where the government's misconduct is "so outrageous that due

-11-

process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." United States v. Russell, 411 U.S. 423, 431-32 (1973); see also United States v. Santana, 6 F.3d 1, 8 (1st Cir. 1993) ("Generally speaking, an outrageous misconduct defense can prosper only if a defendant's due process rights have been violated." (emphasis omitted)).

Djokich argues that the government engaged in this type of outrageous misconduct when it took numerous steps to shift the planned crime to the United States from beyond its borders. He notes that the DeVries plot was first devised at a meeting that took place in Canada, where there was discussion of the recovery of money from DeVries in the Bahamas. Djokich states that none of the original participants (Djokich, DeAngelis, Saffiedie, Nimer, or DeVries) is an American citizen, and neither Djokich nor DeAngelis ever initiated or suggested traveling to, taking action in, or hiring someone from the United States. Only at ICE-Boston's instruction did Saffiedie arrange for the meeting between Djokich and Pasciucco in Boston. Djokich argues that he repeatedly tried to move meetings to, and keep meetings in, Canada. Further, Djokich argues that his willing travel to Boston does not foreclose dismissal based on manufactured jurisdiction.

More significantly, Djokich argues that ICE-Boston deliberately replaced its Canada-based informant, Saffiedie, with an undercover American, Pasciucco, in order to manufacture

jurisdiction where otherwise none would have existed. As Djokich puts it, "ICE-Boston was aware that [the original] proposal . . . did not implicate the United States. Knowing that [recording conversations with the permission of only one party] was unlawful in Canada, Dunn instructed Pasciucco to contact Djokich, who was still in Canada, and set up a meeting in Boston that could be recorded." Therefore, Djokich argues, the government "imposed their jurisdictional agenda" and "defined the terms of the proposed crime itself." He maintains that prior to ICE-Boston's involvement, the DeVries scheme did not contemplate any criminal activity in the United States and that "[s]teering a case to this country in the absence of any factual connection constitutes outrageous governmental misconduct" warranting dismissal of the indictment.

Because Djokich's motion to dismiss the indictment required an examination of "a substantially complete portion of the evidence to be introduced at trial," United States v. Barletta, 644 F.2d 50, 58 (1st Cir. 1981), the district court deferred ruling on the motion until after trial. The district court then denied the motion to dismiss, concluding that the government had not engaged in misconduct, "much less outrageous misconduct":

> [A]lthough the court finds that the government
> acted with the intent to cause a crime in
> violation of the laws of the United States to
> occur where none might have otherwise
> occurred, it did not engage in outrageous
> misconduct. There was not any coercion or

-13-

> abuse by the government of the defendants or of anyone else. As the court noted in [United States v. Lau Tung Lam, 714 F.2d 209, 210 (2d Cir. 1983)], the government has a legitimate interest in identifying and apprehending criminals operating abroad who are willing to commit crimes in the United States. The decision whether to pursue such an investigation is a matter for the exercise of discretion by officials in the Executive branch and does not justify dismissal absent some extreme misconduct.

United States v. Djokich, 718 F. Supp. 2d 173, 176 (D. Mass. 2010) (citations omitted).

## 2. Analysis

We have not yet had occasion to closely examine the concept of manufactured jurisdiction as a subset of the outrageous misconduct doctrine. See United States v. Vasco, 564 F.3d 12, 20 (1st Cir. 2009). We need not make that detailed examination in this case because the facts would not remotely justify the defense of manufactured jurisdiction.

Djokich relies largely on United States v. Archer, 486 F.2d 670 (2d Cir. 1973), in which the Second Circuit reversed convictions under the Travel Act, 18 U.S.C. § 1952, because evidence showed that a federal agent had crossed state lines to place a telephone call to one of the defendants "for the precise purpose of transforming a local bribery offense into a federal crime." Id. at 681; see also United States v. Coates, 949 F.2d 104, 105-06 (4th Cir. 1991) (dismissing an indictment where jurisdiction was founded solely on one interstate phone call placed

-14-

by a federal agent with no affirmative link between the federal element and the defendant's actions); United States v. Brantley, 777 F.2d 159, 163 (4th Cir. 1985) (finding that manufactured jurisdiction occurred in a gambling case where the only interstate activity was the FBI's act of moving gambling machines across state lines to establish the gambling front). Where the "defendant freely participates in the jurisdictional act," however, courts routinely reject manufactured jurisdiction claims. United States v. Peters, 952 F.2d 960, 963 & n.6 (7th Cir. 1992) (collecting cases). Indeed, since Archer, the Second Circuit has explicitly recognized the doctrine's limited reach:

> Courts have refused to follow Archer when there is any link between the federal element and a voluntary, affirmative act of the defendant. Thus, when confronted with situations in which (i) the [government] introduces a federal element into a non-federal crime and (ii) the defendant then takes voluntary actions that implicate the federal element, this Court has consistently held that federal jurisdiction has not been improperly "manufactured" and that the statutory elements have been met, despite the surface similarity to Archer.

United States v. Wallace, 85 F.3d 1063, 1066 (2d Cir. 1996).

Here, while the government first proposed that the meeting between Djokich and Pasciucco happen in the United States, Djokich readily accepted that invitation and twice traveled to Boston in furtherance of the conspiracy. Moreover, when Pasciucco said that he planned to move the location of the kidnaping from the

-15-

Bahamas to Florida, Djokich agreed to the revised plan. In addition, during conversations with Pasciucco, Djokich indicated that after dealing with DeVries, he would need Pasciucco's help in harming another individual in Detroit. Thus, like the district court, we conclude that the government provided Djokich an opportunity to conspire to commit a crime in the United States, and he readily seized that opportunity. Djokich's interactions with government agents fell well short of any plausible concept of manufactured jurisdiction. See United States v. Ramos-Paulino, 488 F.3d 459, 462 (1st Cir. 2007) ("We repeatedly have held that the simple solicitation of a criminal act or the mere provision of an opportunity to engage in one does not meet the threshold requirement for a finding of wrongful inducement."); cf. Lau, 714 F.2d at 210 ("The Government has an entirely legitimate interest in identifying and apprehending European drug dealers willing to bring narcotics to this country for sale."). Without evidence that Djokich was coerced or unduly induced, or evidence that the government engaged in some other type of outrageous misconduct, we agree with the district court's denial of Djokich's motion to dismiss the indictment.

**B. Jurisdictional Entrapment Jury Instruction**

Djokich requested that the court give a jury instruction explaining jurisdictional entrapment or, as he calls it on appeal, entrapment-based manufactured jurisdiction. The proposed

instruction was not a general entrapment instruction and thus did not contemplate an argument that Djokich would not have committed the crime at all but for the alleged government misconduct.[4] Instead, Djokich's requested instruction focused on jurisdiction, and his claim that the government induced him to commit crimes in the United States that he was not otherwise predisposed to commit there. The proposed instruction read as follows:

> Mr. Djokich asserts that he was entrapped into committing the offenses in the United States, thereby making them federal offenses. In other words, he asserts that he was not predisposed to commit those crimes in the United States and that he would not have done so but for the improper inducement of the government or third parties acting on the government's behalf. Jurisdictional entrapment, it is not actually a defense per se, because once raised by a defendant, as Mr. Djokich has done, the government bears the burden of proving beyond a reasonable doubt that he was not jurisdictionally entrapped.
>
> To do this, the government must prove beyond a reasonable doubt either: 1) no government agent, or person acting on behalf

---

[4] The district court stated that if Djokich had requested a general entrapment instruction, it would have permitted Lenz to testify about Djokich kidnaping him and making threats to his life and the lives of his family members. In the court's view, such evidence would have been relevant to Djokich's intent, motive, common scheme or plan, see Fed. R. of Evid. 404(b), and would have been, as the district court said, "quite probative of Mr. Djokich's predisposition to conspire and kidnap . . . [and] to conspire to kill his kidnap[]ing victims." Because Djokich requested a jurisdictional entrapment instruction instead of a general entrapment instruction, the district court excluded Lenz's testimony pursuant to Federal Rule of Evidence 403, which permits exclusion of evidence whose "probative value is substantially outweighed by [the] danger of . . . unfair prejudice."

-17-

of or under the auspices of the government persuaded or induced the defendant to travel in interstate or foreign commerce and use the means, facilities and instrumentalities of interstate or foreign commerce such as would create jurisdiction in the United States; or 2) Mr. Djokich was ready and willing to commit the charged crimes in the United States without any persuasion from the government, its agents, or a person acting on behalf of or under the auspices of the government.[5]

A criminal defendant is entitled to an instruction on the proposed theory of defense when the theory is a valid one, United States v. Rodríguez, 858 F.2d 809, 812 (1st Cir. 1988), and the "evidence adduced at trial, taken in the light most flattering to the accused, . . . plausibly support[s] the theory." Ramos-Paulino, 488 F.3d at 461. The initial burden rests on the defendant to not only raise the defense, but also to identify evidence in the record that supports the theory of defense. Id. at 462. After the defendant has made that threshold showing, the burden shifts to the government to prove beyond a reasonable doubt that either the defendant was not wrongfully induced or the

_____

[5] Djokich's proposed instruction was an inaccurate account of what would constitute inappropriate persuasion or inducement by the government, as it suggests that any inducement by the government is inappropriate. That is not the case; a defendant is only entrapped where the government utilizes wrongful persuasion or inducement. See United States v. DePierre, 599 F.3d 25, 27-28 (1st Cir. 2010) (approving entrapment instruction stating that the government must prove that the government agent "did not improperly persuade or talk the defendant into committing the crime. Simply giving someone an opportunity to commit a crime is not the same as improperly persuading him, but excessive pressure by the [government agent] can be improper." (emphasis added)).

-18-

defendant had a predisposition to engage in such conduct absent the inducement. DePierre, 599 F.3d at 27 (stating that "[g]iven the burden-shifting, the term 'defense' may be thought to understate the government's full burden . . .[, but] in practical terms the [entrapment] defense is difficult for the defendant because the threshold that must be met to show wrongful inducement is a high one").[6]  In determining whether the theory of defense is supported by the record, the district court may not weigh the evidence or make credibility determinations. Rodríguez, 858 F.2d at 812. Because the district court's decision is an inquiry into the legal sufficiency of the evidence, our review is de novo. Id.

Djokich modeled his proposed instruction, inaccurately, on the type of instruction given in general entrapment cases, and we examine it under the same rubric.  As noted, the defense of entrapment requires the defendant to first make a threshold showing on two elements: (1) wrongful inducement of the defendant to engage in criminal conduct, and (2) the defendant's lack of predisposition to engage in such conduct. West v. United States, 631 F.3d 563, 567 (1st Cir. 2011).  As discussed, Djokich essentially adds "in the United States" to the end of each element.  Even assuming – without deciding – that jurisdictional entrapment is a cognizable defense at trial, Djokich did not make the requisite threshold showing of inducement.  The only evidence on inducement showed that

---

[6] See supra note 5.

-19-

Saffiedie twice told Djokich that someone was available to meet with Djokich in the United States. Djokich assented to both meetings in Boston. Pasciucco told Djokich that the crimes Djokich was conspiring to commit needed to be moved from the Bahamas to the United States. Djokich did not protest the venue change; rather, he readily agreed on two separate occasions.

In light of Djokich's voluntary participation in the jurisdictional act, we need not address the predisposition aspect of entrapment, as Djokich has plainly failed to satisfy his burden to make a threshold showing of inducement. See Rodríguez, 858 F.2d at 814. Accordingly, the district court did not err in refusing to give Djokich's proposed jurisdictional entrapment jury instruction.

Affirmed.