# United States Court of Appeals
## For the First Circuit

No. 18-1896

UNITED STATES OF AMERICA,

Appellee,

v.

RAUL ALEXANDER, a/k/a The Old Man,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Leo T. Sorokin, U.S. District Judge]

Before

Howard, Chief Judge,
Lynch and Thompson, Circuit Judges.

James B. Krasnoo and Krasnoo, Klehm & Falkner LLP on brief for appellant.
Randall E. Kromm, Assistant United States Attorney, and Andrew E. Lelling, United States Attorney, on brief for appellee.

April 30, 2020

**LYNCH**, **Circuit Judge**.  Raul Alexander, a citizen of Curaçao, was charged with conspiring to manufacture, distribute, and import cocaine into the United States.  Alexander moved to dismiss the indictment, arguing that recordings done by a confidential witness ("CW") showed that the government could not prove an element of the offense either to the grand jury or before trial.  Specifically, that element was that Alexander knew or intended that the cocaine would be sent to the United States.  From that premise, he argued that the federal courts lack jurisdiction; venue is improper; and the government engaged in "outrageous misconduct" by attempting to manufacture jurisdiction.  The district court denied his motion to dismiss "for the reasons stated in the government's opposition," which included the government's explanations that the recorded conversations and the CW's anticipated testimony constituted sufficient evidence to prove that Alexander knew or intended that the drugs were destined for the United States.

     After the district court denied his motion to dismiss and before trial, Alexander entered into a conditional plea agreement with the government under Fed. R. Crim. P. 11(a)(2).  The plea agreement allowed him to appeal the denial of his motion to dismiss if he were sentenced to more than thirty-six months in prison.  The district court sentenced Alexander to sixty months'

imprisonment.  Alexander appealed, renewing the arguments made in his motion to dismiss.  We affirm the district court's denial.

Alexander also challenges the reasonableness of his sentence.  He argues that his prison sentence is longer than necessary, especially in light of the shorter thirty-six-month sentence given to his co-defendant.  This argument is meritless. The district court articulated a plausible reason for the sentence which explained the difference between the defendants' respective sentences, and Alexander's below-guideline sentence is reasonable.

I.

A.  Facts

Traditionally, we "rebuff efforts to use a motion to dismiss as a way to test the sufficiency of the evidence behind an indictment's allegations."  United States v. Guerrier, 669 F.3d 1, 4 (1st Cir. 2011).  "What counts in situations like this are the charging paper's allegations, which we must assume are true."  Id. at 3-4.  However, Alexander's motion to dismiss was based on the CW's recorded conversations, the government opposed his motion with further evidence of the CW's anticipated testimony, and the district court denied the motion "for the reasons stated in the government's opposition."

On appeal, the government continues to acquiesce in the district court's acceptance of this procedure and urges us to use our "ordinary sufficiency standard."  When reviewing the denial of

- 3 -

Alexander's motion to dismiss, therefore, we draw our facts from the evidence that was in front of the district court when the motion was decided, including transcripts of conversations recorded by the CW and a report by the Drug Enforcement Administration ("DEA") detailing the CW's anticipated testimony.

Alexander pleaded guilty, so when evaluating the reasonableness of Alexander's sentence, "we draw the relevant facts from the plea agreement, the change-of-plea colloquy, the undisputed portions of the presentence investigation report ('PSR'), and the transcript of the disposition hearing." United States v. Gomera-Rodríguez, 952 F.3d 15, 16 (1st Cir. 2020) (quoting United States v. Hassan-Saleh-Mohamad, 930 F.3d 1, 5 (1st Cir. 2019)).

The following facts are common to both inquiries. In July 2015, a CW from the United States began recording phone and text conversations with Alexander's co-defendant, Adalgisa Zefin del Rosario-Jimenez, who lived in Curaçao.[1] The conversations were in Spanish.

The first recorded call occurred on July 23, 2015, when the CW was in the United States and Rosario-Jimenez was in Curaçao. The CW asked Rosario-Jimenez how best to call her from the United

---

[1]     Alexander's brief spells his co-defendant's last names "Rosario-Jiminez." We adopt the spelling "Rosario-Jimenez," which is supported by the weight of the record evidence.

States and gave her a U.S. number she could call if she preferred. During the call, Rosario-Jimenez told the CW that she could sell between ten and twelve kilograms of heroin every two weeks. She also offered that she could sell 100 kilograms of cocaine. The drugs could be delivered in Curaçao, Panama, or, for an additional fee, the United States.

Between August and October 2015, Rosario-Jimenez and the CW exchanged text messages using WhatsApp about a proposed sale of heroin and cocaine by Rosario-Jimenez to the CW. The drugs would be exchanged in Curaçao and thereafter transported to the United States.

On November 16, 2015, the CW proposed to Rosario-Jimenez over text message that they meet in Curaçao in the first week of December. They decided that the deal would be for cocaine only, and on November 18, 2015, discussed methods of transportation of the cocaine to the United States.

On December 3, 2015, the CW met with Rosario-Jimenez in Curaçao to complete the transaction. The CW recorded three of their conversations that day. In the first conversation, Rosario-Jimenez talked about her past experiences importing drugs into the United States. She described how "mules" would swallow capsules of drugs called "eggs" or "bullets" and then fly to the United States on commercial airline flights. She admitted that she had once sent heroin to a former boyfriend in Lawrence, Massachusetts,

and on another occasion had sent heroin to Boston by way of the Dominican Republic.

Rosario-Jimenez stated to the CW that she "worked with one person as a source of supply for cocaine." She then called the person she identified as that source in front of the CW and said to the source: "You remember what we were talking about? That guy is here."

During the second recorded conversation, Rosario-Jimenez drove with the CW to Alexander's house to complete the cocaine transaction. The recording continued after they entered Alexander's home. This is the only recording where Alexander was present. On the drive over, the CW realized for the first time they were not going to Rosario-Jimenez's house and expressed concern about going to a stranger's house. She reassured the CW that they would be safe and that she and Alexander do business together.

Once at the house, Alexander, Rosario-Jimenez, and the CW began talking. Rosario-Jimenez told the CW, in front of Alexander, that people in Curaçao had been afraid to deal with customers from the United States since someone was arrested for selling to an undercover law enforcement officer. Alexander indicated that he was familiar with that case and noted that the person who was arrested was merely holding the drugs for someone else.

The CW then mentioned that heroin was selling for a high price in Boston. Alexander asked if the CW could send him two U.S. drug mules, ideally ones that could pose as a couple to avoid arousing suspicion. He suggested the possibility of an on-going arrangement where Alexander, the CW, and Rosario-Jimenez would import controlled substances into Massachusetts. The profits from this proposed deal would be split three ways between them.

The CW then told Rosario-Jimenez and Alexander that the money needed to complete the transaction was located off-site. The CW and Rosario-Jimenez left, ostensibly to retrieve the money.

The third conversation recorded by the CW occurred during the CW's car ride with Rosario-Jimenez after meeting with Alexander. During that conversation, Rosario-Jimenez told the CW that she had talked to Alexander for an hour to get him to participate in the cocaine deal.

After Rosario-Jimenez and the CW left Alexander in his house, law enforcement officers arrived and searched Alexander's house. They found approximately eleven kilograms of cocaine, a rifle, and drug paraphernalia, including the press to make drugs into "eggs" that then could be smuggled. Alexander was arrested outside his house and was found with a pistol in his waistband, along with a magazine and four rounds of ammunition. Rosario-Jimenez was arrested the same day.

B.    Procedural History

Alexander and Rosario-Jimenez were indicted on January 13, 2016, in the U.S. District Court for the District of Massachusetts for conspiring to manufacture and distribute cocaine for unlawful importation into the United States and conspiring to unlawfully import cocaine into the United States in violation of 21 U.S.C. §§ 963, 952, 959(a), and 960(b)(1)(B).  They were also charged with forfeiture under 21 U.S.C. §§ 853 and 970.

Alexander was extradited from Curaçao and arrived at Boston Logan International Airport on or about May 31, 2017. Alexander is not a citizen of the United States and had never resided in this country.

Alexander filed a motion to dismiss the charges against him on June 5, 2018.  He attached to the motion transcripts of the CW's recorded conversations, which he had received in discovery. He contended that the recorded conversations "present no evidence to demonstrate that Alexander knew that the cocaine he intended to distribute in Curaçao to the [CW] was to be imported to the United States."  As a consequence, "the United States cannot prove an essential element of the offense with which Alexander is charged." The grand jury, upon "information and belief," could not have returned a valid indictment, and the government would not have sufficient evidence to support the charge at trial.  In addition, "[n]either jurisdiction nor venue exists in the District of

Massachusetts or anywhere else in the United States." And any claimed jurisdiction is the result of "outrageous government misconduct" because federal agents engaged in "[j]urisdictional entrapment" by "creat[ing] the fiction of Boston as the destination to which [the CW] claimed the drugs were going to be imported." He argued that his motion could be addressed pretrial,[2] and requested an evidentiary hearing so that he could question the CW.

The government argued that Alexander's issues were better decided post-trial but also opposed his motion to dismiss on the merits and attached to its filing a copy of the DEA report with the CW's anticipated testimony. The government argued that it had sufficient evidence about which "the government believes reasonable inferences can and should be drawn" to conclude that Alexander knew and intended for the cocaine to be imported into the United States, thereby defeating all of Alexander's related legal challenges.

The district court denied Alexander's request for an evidentiary hearing on his motion to dismiss on May 22, 2018. On

---

[2] "A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). Motions based on improper venue, an error in the grand jury proceedings, and failure to state an offense must be raised pretrial "if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." Fed. R. Crim. P. 12(b)(3).

- 9 -

June 27, 2018, the district court denied the motion to dismiss "for the reasons stated in the government's opposition."

On July 12, 2018, at what was scheduled to be the final pretrial conference, the government and Alexander announced that they had reached a deal for a conditional plea. Under the terms of the plea agreement, Alexander retained the right to appeal the denial of his motion to dismiss if he were sentenced to more than thirty-six months' imprisonment. If his appeal were successful, he could then withdraw his guilty plea. Under Fed. R. Crim. P. 11(a)(2), the district court was required to give its consent to the condition placed on the plea agreement, and it did so.

Alexander was sentenced on September 13, 2018. The court calculated a guideline sentencing range of 87 to 108 months' imprisonment and between one and three years' supervised release. Alexander had a Total Offense Level of 29 and a Criminal History Category of I.

The government recited the facts it believed it could have proved if the case had proceeded to trial. Alexander made some minor objections to the government's description of the facts, but both parties agreed that, even with the objections, the facts were legally sufficient for the court to accept Alexander's plea. The court imposed a below-guideline sentence of sixty months' imprisonment and three years' supervised release.

Alexander's co-defendant Rosario-Jimenez also pleaded guilty to the same offense on May 31, 2017, over a year before Alexander pleaded guilty. She had a Total Offense Level of 27 and a Criminal History Category of I. Her guideline sentencing range was lower than Alexander's because she was not found with a gun: 70 to 87 months' imprisonment and between one and three years' supervised release. She was sentenced on September 6, 2017, to thirty-six months in prison and three years of supervised release. The same district court judge sentenced both defendants.

Following the imposition of his sentence, Alexander timely appealed.

## II.

Alexander makes a number of legal arguments that he describes as jurisdictional. They all arise from the same alleged flaw in the government's case: that the government has no evidence that Alexander knew that the cocaine was going to be imported into the United States. According to Alexander, a cascade of legal issues arises as a consequence.

## A.   Waiver/Bar Argument

The government argues that we need not reach the merits of Alexander's arguments because he waived them by pleading guilty:

> At his Rule 11 hearing, after having been informed of the elements of the importation offense -- including the requirement of an agreement to import cocaine into the United States (or to distribute cocaine for purposes

of importation) and his knowing and willful joining in that agreement, Alexander informed the district court that he was pleading guilty because "[he was], in fact, guilty." Alexander also affirmatively agreed that the undisputed facts set forth by the government were sufficient to provide a factual basis for the plea to importation.

(Alteration in original) (internal citations omitted).

There is some tension between Alexander's pleading guilty because "he was, in fact, guilty," and the substance of his motion to dismiss, which, in short, maintains that Alexander is not guilty of the charged offense because he did not know the cocaine was going to be imported into the United States. But that tension is inherent in the plea agreement struck by the government and the defendant.

The plea agreement states: "Defendant expressly and unequivocally admits that he committed the crime charged in Count I of the Indictment, did so knowingly and intentionally, and is in fact guilty of that offense." In the next sentence it states:

Defendant's plea shall, with the U.S. Attorney's consent, be a conditional plea of guilty, reserving Defendant's right to appeal the denial of his Motion to Dismiss (Docket No. 102) pursuant to Fed. R. Crim. P. 11(a)(2), if he receives a sentence of more than 36 months of imprisonment. Defendant will have the right to withdraw his guilty plea should Defendant prevail on appeal.

Both the Supreme Court and this circuit have heard waiver/bar arguments in conditional plea cases and rejected them.

In Doggett v. United States, 505 U.S. 647 (1992), the defendant entered a conditional guilty plea, "thereby securing the Government's explicit consent to his reservation of 'the right to appeal the adverse Court ruling on his Motion to Dismiss for violation of Constitutional Speedy Trial provisions based upon post-indictment delay.'" Id. at 658 n.3 (citation omitted). The Supreme Court held that "[o]ne cannot reasonably construe this agreement to bar Doggett from pursuing as effective an appeal as he could have raised had he not pleaded guilty." Id. (emphasis added).

Similarly, in United States v. Caraballo-Cruz, 52 F.3d 390 (1st Cir. 1995), this circuit began its analysis by looking to Fed. R. Crim. P. 11(a)(2), the provision that permits conditional plea agreements. Id. at 392. It held:

> The import of this rule is open and obvious: it is designed to "ensure careful attention to any conditional plea," to "identify precisely what pretrial issues have been preserved for appellate review," and to husband scarce judicial resources by permitting a defendant fully to litigate hoarded issues while at the same time lessening the burden on busy district courts and sparing the sovereign the expense of trial.

Id. (citing Fed. R. Crim. P. 11 advisory committee's note). "Having secured a plea by means of this accommodation, the government cannot now retract its acquiescence. After all, '[h]aving one's cake and eating it, too, is not in fashion in this

- 13 -

circuit.'" Id. at 393 (alteration in original) (quoting United States v. Tierney, 760 F.2d 382, 388 (1st Cir. 1985)). For this reason, we reject the government's argument that Alexander's conditional guilty plea bars the jurisdictional arguments made in his motion to dismiss or this appeal.

B.    Merits of Alexander's Jurisdictional Arguments

Alexander's jurisdictional arguments fail on the merits. Challenges to sufficiency of the government's evidence, the court's jurisdiction, denial of a motion to dismiss based on venue, and denial of a motion to dismiss based on outrageous government misconduct are all reviewed de novo. See United States v. Tanco-Baez, 942 F.3d 7, 15 (1st Cir. 2019) (sufficiency of the evidence); United States v. Bravo, 489 F.3d 1, 6 (1st Cir. 2007) (jurisdiction); United States v. Salinas, 373 F.3d 161, 164 (1st Cir. 2004) (venue);[3] United States v. Anzalone, 923 F.3d 1, 5 (1st Cir. 2019) (outrageous government misconduct).

In sufficiency of the evidence challenges, we "consider[] the evidence in the record 'in the light most favorable to the prosecution.'" Tanco-Baez, 942 F.3d at 15 (quoting United States v. Lara, 181 F.3d 183, 200 (1st Cir. 1999)). In venue

---

[3]    "When a defendant in a criminal case appeals from a venue determination, we review the trial court's legal conclusions de novo and its factual findings for clear error." Salinas, 373 F.3d at 164 (emphasis added) (citing United States v. Scott, 270 F.3d 30, 34 (1st Cir. 2001)).

challenges, "we align the evidence of record in the light most flattering to the venue determination." Salinas, 373 F.3d at 164.

### 1. Sufficiency of the Evidence

Alexander argues that the government cannot prove the element of the charged offense that he intended or knew that the cocaine would be imported into the United States. In sufficiency of the evidence challenges, we consider whether the "body of proof, as a whole, has sufficient bite to ground a reasoned conclusion that the government proved each of the elements of the charged crime beyond a reasonable doubt." Tanco-Baez, 942 F.3d at 15 (quoting Lara, 181 F.3d at 200).

"To prove a defendant's participation in a conspiracy, the government must show two types of intent: the defendant's intent to join the conspiracy and his intent to perpetrate the underlying substantive offense." United States v. Rodríguez-Milián, 820 F.3d 26, 31 (1st Cir. 2016). Alexander argues that he did not have the intent or knowledge that the cocaine would be unlawfully imported into the United States, as required by 21 U.S.C. § 959(a).[4] "[C]onspiratorial agreement need not be express

---

[4] When the conspiracy at issue in this case was active, § 959(a) stated: "It shall be unlawful for any person to manufacture or distribute a controlled substance . . . intending [or] . . . knowing that such substance or chemical will be unlawfully imported into the United States . . . ." 21 U.S.C. § 959(a) (amended 2016). This provision of the statute was amended to cover people "intending, knowing, or having reasonable cause to believe." Id. (currently in force) (emphasis added).

so long as its existence can plausibly be inferred from the defendants' words and actions and the interdependence of activities and persons involved." United States v. Appolon, 715 F.3d 362, 370 (1st Cir. 2013) (alteration in original) (quoting United States v. Boylan, 898 F.2d 230, 241-42 (1st Cir. 1990)).

The evidence is sufficient to support the inference that Alexander knew the cocaine was destined for the United States. Alexander discussed with Rosario-Jimenez and the CW that Curaçaon drug dealers were afraid of selling drugs to U.S. buyers ever since someone was arrested after selling to undercover law enforcement. The CW told Alexander about the high price of heroin in Boston. Alexander replied by suggesting that the three of them start a business importing drugs into the United States and asked the CW if he could supply two U.S. drug mules. These statements evidence that Alexander knew the CW was American and the cocaine was destined for the United States.

There was also ample evidence from the first and third recorded conversations that Rosario-Jimenez knew where the cocaine was going, and evidence both that Rosario-Jimenez and Alexander had a long-standing business relationship and that they had talked about the details of this particular deal in depth. Rosario-Jimenez called her drug source in the CW's presence before going to Alexander's house, saying "[y]ou remember what we were talking about? That guy is here." She reassured the CW that doing the

transaction at Alexander's house was safe because she and Alexander do business together. When she left Alexander's house, Rosario-Jimenez told the CW that she talked to Alexander for an hour to convince him to participate in the cocaine deal. It would be reasonable to infer that Rosario-Jimenez told Alexander where the cocaine was going.

Since the evidence is sufficient to establish guilt beyond a reasonable doubt, it is necessarily sufficient to establish probable cause. His challenge to the validity of the grand jury indictment also fails.

2. Federal Jurisdiction

Alexander argues the specific element of the charged offense the government cannot prove is essential to the federal courts' jurisdiction; therefore, because he did not know or intend that the drugs would be imported into the United States, the federal courts lack jurisdiction over his case. Under 21 U.S.C. § 959(c), the statute "reach[es] acts of manufacture or distribution committed outside the territorial jurisdiction of the United States."[5] Alexander does not argue that this provision on its face is deficient. Nor does he argue that it would be improperly applied to him if he did, in fact, know the cocaine was going to be imported into the United States. See Am. Fiber &

_____

[5] This language was moved to 21 U.S.C. § 959(d) in May 2016.

- 17 -

Finishing, Inc. v. Tyco Healthcare Grp., LP, 362 F.3d 136, 139 (1st Cir. 2004) ("Federal courts are expected to monitor their jurisdictional boundaries vigilantly and to guard carefully against expansion . . . ."). Since the government can produce the evidence required to support a conviction for drug conspiracy, the federal courts have jurisdiction. Nothing about the facts of this case raises any jurisdictional concerns.

3. Venue

"When [venue] is challenged, the government must prove by a preponderance of the evidence that venue is proper as to each individual count." Salinas, 373 F.3d at 163. At the time Alexander was charged, 21 U.S.C. § 959(c) provided that "[a]ny person who violates this section shall be tried in the United States district court at the point of entry where such person enters the United States, or in the United States District Court for the District of Columbia." This language was eliminated when § 959 was amended in 2017. Venue now rests on 18 U.S.C. § 3238, which provides that "trial of all offenses begun or committed . . . out of the jurisdiction of any particular State or district, shall be in the district in which the offender . . . is first brought." Again, Alexander does not challenge the statutory basis for venue, but merely argues that he did not, in fact, commit an offense at all. This argument fails for the same reason his other challenges fail.

4.    Manufactured Jurisdiction

Alexander argues that "the Government engaged in outrageous government misconduct by manufacturing Boston as the destination for the cocaine" when "[t]he destination of Boston was supplied only by the [CW]."  "[T]he concept of manufactured jurisdiction as a subset of the outrageous misconduct doctrine" has "limited reach."  United States v. Djokich, 693 F.3d 37, 45 (1st Cir. 2012).

Alexander must show that he was "coerced or unduly induced" or "that the government engaged in some other type of outrageous misconduct."  Id. at 46.  The evidence does not support either argument.  He was not coerced.  There was no misconduct here.  The government merely provided Alexander the opportunity to participate in the conspiracy, which he did.

                              III.

Alexander also challenges the reasonableness of his sentence, arguing that it is greater than necessary, especially in light of the disparity between his sentence and that of his co-defendant Rosario-Jimenez.  Our review is for abuse of discretion. See United States v. Vargas-García, 794 F.3d 162, 165 (1st Cir. 2015).  We find none, and Alexander's argument fails.

A district court is instructed under 18 U.S.C. § 3553(a)(6) "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of

similar conduct."  This Court has said that this provision is "primarily aimed at national disparities, rather than those between co-defendants."  United States v. Rivera-Gonzalez, 626 F.3d 639, 648 (1st Cir. 2010) (quoting United States v. Marceau, 554 F.3d 24, 33 (1st Cir. 2009)).  Nonetheless, the district court "can consider disparities between codefendants."  United States v. Reyes-Santiago, 804 F.3d 453, 467 (quoting United States v. Correa-Osorio, 784 F.3d 11, 28 n.25 (1st Cir. 2015)).

A "defendant is not entitled to a lighter sentence merely because his co-defendants received lighter sentences." Rivera-Gonzalez, 626 F.3d at 648 (quoting United States v. Wallace, 573 F.3d 82, 97 (1st Cir. 2009)).  We "routinely reject[] disparity claims" where the defendants "fail to acknowledge material differences between their own circumstances and those of their more leniently punished confederates."  Reyes-Santiago, 804 F.3d at 467.  Such is the case here.

Alexander argues that his sentence is unreasonably long when compared to Rosario-Jimenez's sentence because the quantity of cocaine was the same in both cases, both defendants pleaded guilty, and both were first-time offenders.  In fact, the district court explicitly discussed the disparity.  It reduced Alexander's sentence from the guideline range because of its comparison of the two and the fact that Rosario-Jimenez received a lesser sentence. And it stated its reasons for giving Alexander the higher sentence.

Although Alexander and Rosario-Jimenez were charged with the same offense, Alexander had a higher guideline range because he had two levels added to his offense level pursuant to U.S.S.G. § 2D1.1(b)(1) for being found with a firearm when he was arrested. Alexander's guideline range was 87 to 108 months' imprisonment; Rosario-Jimenez's was 70 to 87 months' imprisonment. See United States v. Peña-Santo, 809 F.3d 686, 705 (1st Cir. 2015) (noting that the defendant was "not entitled to the same sentence as [his codefendant]" in part because the co-defendant "received a minor role reduction and [the defendant] did not").

In addition, the district court explained that Rosario-Jimenez received a below-guideline sentence because "there were certain personal issues and life history issues that [it] thought were material to sentencing." The district court heard evidence about Alexander's family and other personal circumstances. And the court acknowledged those personal circumstances as a reason for not imposing a higher sentence on Alexander than the one it did. But the court concluded that Rosario-Jimenez's unique personal circumstances that were the basis for her specific sentence "don't generally apply to Mr. Alexander."

Specifically, Rosario-Jimenez suffered from a history of physical and sexual abuse, domestic violence, mental health issues, and substance abuse. Alexander grew up poor and was raised by his sister from the age of ten in the Dominican Republic while

his mother lived in Curaçao with a new husband. The district court was not obligated to view Alexander's personal circumstances in the same way it viewed Rosario-Jimenez's. See United States v. Clogston, 662 F.3d 588, 593 (1st Cir. 2011) ("That the sentencing court chose not to attach to certain of the mitigating factors the significance that the appellant thinks they deserved does not make the sentence unreasonable.")

Finally, Alexander argues that Rosario-Jimenez was more culpable than Alexander because her "known individualized conduct was much more substantial than Alexander's," thereby making his relatively higher sentence more unreasonable. Cf. United States v. Reverol-Rivera, 778 F.3d 363, 366 (1st Cir. 2015) ("[W]e have made clear that differences in culpability can justify disparate sentences among co-defendants.").

A significant part of the sentencing hearing was devoted to discussing the two defendants' relative culpability. After hearing from both lawyers, the district court accepted their characterization of Rosario-Jimenez as the "driving force" behind the cocaine transaction and allowed that Alexander was possibly only a "broker" in this particular deal. Nonetheless, the district court did not accept the defense's characterization of Alexander's involvement in the drug trade as being limited to this one deal.

In assessing Alexander's culpability, the district court considered the machine found in Alexander's house that was used to

turn drugs into "eggs" that could then be smuggled by mules. The court saw that as evidence that he was "preparing drugs for distribution or importation to somewhere." Alexander also had a weapon on his person, which the court saw as evidence that he was familiar with the drug business. And the court judged that Alexander was motivated to participate in drug transactions for the money, not, like Rosario-Jimenez, because of a drug addiction.

There was no abuse of discretion in any of the district court's analyses. The district court gave a "plausible rationale" and reached "a defensible result." Vargas-García, 794 F.3d at 167. Alexander's challenge to the reasonableness of his sentence is meritless. In particular, there is no merit to his argument that the only rationale that the district court could have used "is Alexander is a man and [Rosario-Jimenez] is a woman." The court reasonably relied on Alexander's higher sentencing range, facts about his personal life, and his level of culpability.

IV.

The district court's denial of Alexander's motion to dismiss and the sentence imposed are affirmed.